**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **Hope Halleen and Donna Maner, individually and on behalf of all other similarly situated,** | |
| **Plaintiffs,** | **Civil Action No. 4:16-cv-00055-ALM** |
| **v.** | |
| **BELK, INC.,** | |
| **Defendant.** | |

**JOINT MEMORANDUM OF LAW IN SUPPORT
OF FLSA COLLECTIVE ACTION SETTLEMENT**

## I.       INTRODUCTION

Plaintiffs Hope Halleen and Donna Maner (the "Named Plaintiffs") filed this collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), alleging that Defendant Belk, Inc. ("Belk" or "Defendant") failed to pay them and others similarly situated, overtime compensation (the "Halleen Litigation" or the "Lawsuit"). [Dkt. No. 2].  Belk is a privately-owned department store company based in Charlotte, North Carolina, which encompasses approximately 294 stores located in sixteen states. The Halleen Litigation, which was filed in January 2016, consists of 384 individuals who opted into the Lawsuit and allege that Belk improperly classified Sales Team Managers ("STMs") as exempt employees under the FLSA and did not pay them overtime for hours worked over 40 hours per week. [Dkt. No. 2]. STMs are the first line managers in the individual departments within each Belk store.

Following careful investigation, contested motion practice as to conditional certification, discovery and other issues; extensive formal discovery, including taking 19 depositions, exchanging over one million documents, including policy documents, emails, personnel records, payroll data, training materials, internal studies, and the exchange of responses to multiple interrogatories and document production requests; multiple discovery and Electronically Stored Information ("ESI") conferrals; attendance at a full-day mediation conference, and; exhaustive post-mediation settlement negotiations, the Parties have agreed, subject to Court approval, to resolve the collective action overtime claims now asserted in the Halleen Litigation.

For the reasons explained in detail below, the Parties request this Court to enter an Order, in the proposed form attached hereto as **Exhibit 1** approving: (i) the settlement set forth in the Stipulation and Settlement Agreement attached hereto as **Exhibit 2**; (ii) the Parties' proposed notice and the mailing of the Notice Packet and Settlement Check attached hereto as **Exhibit 3**; (iii) appointment of Rust Consulting, Inc. as the Claims Administrator and its fees and costs for

issuing the Notice and the Settlement Checks; and (iv) Plaintiffs' Counsel's request for reasonable attorneys' fees and reimbursement of costs and expenses.

## II.     FACTUAL BACKGROUND

### A.     Factual Allegations

Founded in 1888 by William Henry Belk, Belk is a national retail company that operates approximately 294 department stores in sixteen southern states.  Belk offers a wide assortment of national brands and private-label fashion apparel, shoes, and accessories for the entire family along with top-name cosmetics, a wedding registry, and a large selection of quality merchandise for the home. Each Belk department store employs a certain number of STMs that are assigned to one or more departments within each store location.

The Named Plaintiffs and opt-ins allege that their actual day-to-day duties did not constitute exempt work under the FLSA. Specifically, Plaintiffs allege that Belk improperly classified them and other STMs as exempt employees and did not pay them overtime for hours worked over 40 hours per week. Belk, on the other hand, denies any liability or wrongdoing of any kind associated with the claims that are alleged in the Halleen Litigation and the First Amended complaint, and, for any purpose other than settling the Halleen Litigation, denies that this action is appropriate for collective treatment.

### B.     Overview of Litigation and Settlement Negotiations

Plaintiffs filed their original complaint on January 16, 2016, and their First Amended Complaint on January 25, 2016. [Dkt. Nos. 1 and 2]. Defendant filed its Answer and Affirmative Defenses to Plaintiff's Complaint on March 4, 2016 asserting thirteen (13) Affirmative Defenses. [Dkt. No. 14].  On September 16, 2016, this Court conditionally certified a collective consisting of all individuals employed by Belk who were:

current and former Sales Team Managers who worked at any of Defendant's locations at any time during the three-year period preceding the filing of this lawsuit.

[*See* Dkt. No. 44].  Notice and Consent Forms were issued to approximately 1,793 current and former STMs and three-hundred and eighty-four (384) individuals opted into the Halleen Litigation.  Every Halleen Opt-In Plaintiff executed a nearly-identical Consent to Join form, which stated that each such individual designated the Shavtiz Law Group, P.A., and/or Hepworth, Gershbaum & Roth, PLLC, to ". . . represent me and make decisions on my behalf concerning the litigation *and any settlement*.  I agree to be bound by any adjudication of this action by the Court, whether it is favorable or unfavorable." (emphasis added). [*See, e.g.,* Dkt. Nos. 11-1 and 78-1].

The Parties originally disputed the scope of permissible discovery and provided lengthy briefing on this issue to the Court.  On April 26, 2017, this Court permitted Defendant to take the depositions of up to twenty-five Halleen Opt-In Plaintiffs as a means to obtain a sample of Halleen Opt-In Plaintiffs and narrow the scope of discovery. [Dkt. No. 84].  Moreover, the Court ordered that all Halleen Opt-In Plaintiffs who are deposed must answer Defendant's written discovery . . . [and] Any Opt-In Plaintiff who fails or refuses to participate in discovery or deposition will not be dismissed from the lawsuit, but must be replaced by another Opt-In Plaintiff selected by Defendant. [*Id.*].

The Parties engaged in hard fought, intense, and lengthy discovery, which included the Parties completing nineteen (19) depositions, 18 of which were of the Halleen Opt-In Plaintiffs and another being a third-party deposition of a former Belk Regional Vice President.   In addition, both sides interviewed dozens of potential witnesses. Moreover, Belk produced nearly one million documents, including policy documents, emails, personnel records, payroll data, training materials, schedules, internal studies, and responded to several sets of interrogatories

4

and document production requests. Further, Belk disclosed 111 witnesses and was in the process of producing terabytes of data to Plaintiffs. Plaintiffs' counsel had noticed additional fact witness and corporate representative depositions and was continuously reviewing the voluminous production of documents and ESI from Defendant.  Thus, substantial work remained to prepare for decertification and trial.

However, the two years of hard fought discovery made it very clear to the Parties that the risks and uncertainties were substantial.  Belk maintains there were differences in job duties and responsibilities of STMs that provided a substantial hurdle for Plaintiffs at decertification. Further, even if the collective members survived a forthcoming decertification motion, Belk maintains the differences made victory at trial and recovery less than certain and a third year of liability unlikely. Plaintiffs disagreed with Belk's assertion, maintaining that the deposition testimony demonstrated a uniform misclassification of the STM position.  Plaintiffs further countered by obtaining individual retainer agreements from hundreds of opt-ins, allowing them to expeditiously continue to pursue their claims in the event of decertification.  Plaintiffs also maintain that a third-year of liability was likely given information ascertained from discovery in this litigation.

Thus, recognizing those uncertainties and the continued costs of defense of the litigation to Belk, the Parties engaged in settlement discussions throughout September 2018.  Finally, after several rounds of negotiations, on October 5, 2018, the Parties reached an agreement to settle the Halleen Litigation and the claims of all Halleen Opt-In Plaintiffs, and memorialized the terms of the agreement in a signed Memorandum of Understanding.

Thereafter, the Parties have worked diligently throughout the last month in finalizing the terms of the Stipulation and Settlement Agreement as well as the instant motion to the Court and

the proposed scheduling dates. As outlined in the Agreement attached hereto, the Parties have made an expeditious effort to provide Settlement Collective Members with Settlemen4t Checks by early January 2019.  The Parties respectfully request that this Court approve and enforce the terms of the proposed Stipulation and Settlement Agreement[1].

## III.   PROPOSED SETTLEMENT TERMS

### A.    The Settlement Checks & Allocation Formula

Under the proposed Stipulation and Settlement Agreement attached hereto, the Parties agree to pay each Settlement Collective Member an overtime Settlement Check.  *See* Ex. 2. The Stipulation and Settlement Agreement includes: ████████████████████████

████████████████████████████████████████████

████████████████████████████████████

███████████████    ███████████████████████

██████████████

This is not a common fund case where a claim form must be submitted to receive a pro rata share check. In consideration for settlement and a release of all FLSA claims of the Settlement Collective Members against Defendant, each Plaintiff and Opt-In Plaintiff shall receive a Settlement Check as set forth in Paragraph 15 of the attached Stipulation and Settlement Agreement. Ex. 2, ¶ 15. An individual's Settlement Check will be for a share of the Gross Member Payment and is calculated as follows:

> Each Settlement Collective Member shall receive a "Minimum Payment" of ██████████████████ from the Net Member Payment in addition to any proportionate settlement share they are allocated as described in this Section, for "Aggregate Minimum Payments" of ██████████████████
> ██████████████ The amount of the Net Member Payments

---

[1] Capitalized terms are defined in the Parties' Stipulation and Settlement Agreement (*see* Exhibit 2) and carry those same definitions herein.

remaining after the Aggregate Minimum Payments, Enhancement Award Checks, and employer-side payroll taxes is the "Net Member Payment Balance."

As to the distribution Net Member Payment Balance, each Settlement Collective Member who has not been involuntarily dismissed from the Halleen Litigation shall be assigned two (2) points for each of his or her full workweeks worked as a STM during the period beginning on the date three years prior to the date on which he or she filed their written consent to join the Halleen Litigation and ending on November 5, 2018.

As to the distribution of the Net Member Payment Balance, each Settlement Collective Member who has had his or her claims involuntarily dismissed from the Halleen Litigation shall be assigned one (1) point for each of his or her full workweeks worked as an STM during the period beginning on the date three years prior to the date on which he or she filed their written consent to join the Halleen Litigation and ending on November 5, 2018 during the three-year period immediately preceding the date on which he or she filed their written consent to join the Halleen Litigation.

To calculate each Settlement Collective Members' proportionate share of the Net Member Payment Balance: [1] Add all points for all Settlement Collective Members together to obtain the "Denominator"; [2] Divide the number of points for each Settlement Collective Member by the Denominator to obtain each Settlement Collective Member's "Portion of the Net Member Payment Balance"; [3] Multiply each Settlement Collective Member's Portion of the Net Member Payment Balance by the Net Member Payment Balance to determine each Settlement Collective Member's "Individual Share of the Net Member Payment Balance."

Each Settlement Collective Member's individual Net Member Payment shall be the total of the ███████ Minimum Payment set forth in Paragraph 15(b)(iii) of the Stipulation and Settlement Agreement plus any Individual Share of the Net Member Payment Balance as described in Paragraph 15(b)(iv—vi) of the Stipulation and Settlement Agreement.

All 384 Settlement Collective Members will receive at least one Settlement Check with a 50% portion of each Settlement Collective Members' Settlement Check that is treated as owed wages and the other 50% portion treated as liquidated damages. Ex. 2, ¶ 15(g). The 50% portion

of the Settlement Collective Members' Settlement Check that is treated as owed wages will be made net of all applicable employment taxes, including, without limitation, federal, state, and local income tax withholding and the employee share of the FICA tax, and shall be reported as earned in the year of payment to the Internal Revenue Service. *Id*. This portion of the Settlement Check will be reported under the Settlement Collective Member's Social Security Number on an IRS Form W-2. *Id*.  The remaining 50% liquidated damages portion of the Settlement Collective Members' Settlement Check shall be made without withholdings and shall be reported as earned in the year of payment to the IRS. *Id*.  This portion of the Settlement Check will be reported under the Settlement Collective Member's name and Social Security Number on an IRS Form 1099. *Id*.

The Claims Administrator will be responsible for determining the appropriate number of exemptions to be used in calculating payroll taxes and withholdings, deciding the appropriate tax rate, issuing Settlement Checks and issuing IRS Forms W-2 and Form 1099. *Id*.

B.    **Enhancement Award Checks**

In addition to the overtime Settlement Checks detailed above, to acknowledge their service to the Opt-In Plaintiffs, the two Named Plaintiffs are eligible for Enhancement Award Checks of up to ███ each. Ex. 2, ¶ 16(b).  The Stipulation and Settlement Agreement also contemplates the Halleen Opt-In Plaintiffs who sat for lengthy and contentious depositions, and each participated in multiple deposition preparation conferences with counsel, to receive enhancements as well.  *Id*. The Parties propose Enhancement Award Checks of up to ████ to the other sixteen Halleen Opt-In Plaintiffs who provided deposition testimony during the Halleen Litigation. *Id*.   However, in order to receive an Enhancement Award Check, the Settlement Collective Member must, in advance, sign the general release as set forth in Paragraphs 19 and 20 of the Stipulation and Settlement Agreement and return it to the Claims

Administrator before the Claims Administrator sends the Settlement Collective Member's Enhancement Award Check. The Claims Administrator may not forward the Enhancement Award Check to the Settlement Collective Member until the Claims Administrator receives a copy of the fully signed general release and all revocation periods have expired without revocation.  Thus, Settlement Collective Members who receive an Enhancement Award, and who comply with the above, will receive two checks: one will be the Settlement Check calculated under the formula set forth above and the second will be the Enhancement Award Check. *Id*.

    C.    **Release**

Settlement Collective Members who participate in the settlement will release any and all wage and hour FLSA claims against Belk which are asserted in this Lawsuit or could have been asserted in this Lawsuit.  To participate in the settlement and execute a valid release against Belk, the Settlement Collective Member, upon signing, depositing, and/or cashing the Settlement Check, releases, to the extent permitted by law, any and all wage and hour FLSA claims, known or unknown, contingent or accrued, against Belk, its parent or subsidiary corporations and all agents thereof, arising under the FLSA which arise from the claims in, or could have been pleaded in, the operative complaint in the Lawsuit herein upon approval of the settlement by the Court. This information will be detailed on the reverse side of each Settlement Check, above the space for endorsement, and include the following settlement and release language in favor of Belk:

> "By negotiating and cashing this check: (1) I agree to be bound by the Settlement Agreement reached in *Halleen, et al. v. Belk, Inc.*, Case No. 4:16-CV-00055, U.S. District Court, Eastern District of Texas ("the Lawsuit"); and (2) I release any and all wage and hour claims I have or may have for the period from Jan. 1, 2013 to [insert date that is the earlier of the date of the Court's approval or January 15, 2019] that were brought or could have been brought in

> the Lawsuit against Belk, Inc. and its affiliates, parents, subsidiaries, predecessors, successors, employees and agents, under the Fair Labor Standards Act and any federal or state wage and hour statutory or common law."

*See* Ex. 1, at ¶ 15(c).  Each Settlement Check will also bear a legend directing the payer's bank to only accept the settlement check for payment if: (a) the settlement check is endorsed by the payee; and (b) the settlement and release language, or any part of it, has not been altered or deleted.  *Id.*

If the Settlement Collective Member fails to cash his/her Settlement Check within the 120-day Acceptance Period of distribution, the uncashed check and the unclaimed funds shall revert to Belk. Ex. 2, ¶ 15(d). Any Settlement Collective Member who does not timely sign and cash a Settlement Check will not be bound by any release of claims. Ex. 2, ¶ 15(d).

Further, each individual receiving an Enhancement Award Check must sign the general release, in the manner described above, and as set forth in Paragraphs 16(b), 19, and 20 of the Stipulation and Settlement Agreement *and* endorse the Settlement Check as part of his/her release of claims against Belk. *See* Ex. 1, ¶¶ 16(b), 19, and 20.

D.     **Notice to the Opt-In Plaintiffs and Distribution of Settlement Checks**

The Claims Administrator will mail within ten (10) calendar days of the Effective Date a Notice Packet along with the Settlement Check to each Settlement Collective Member, and, if applicable, general release forms to execute and return to the Claims Administrator in exchange for Enhancement Award Checks to the Halleen Opt-In Plaintiffs who gave deposition testimony. Ex. 2, ¶ 15(f). Settlement Collective Members are not required to do anything – such as, submit a claim form – to receive a Settlement Check.

The proposed Notice Packet, attached hereto, informs Settlement Collective Members of the general terms of the settlement, the Settlement Collective Member's individual settlement

allocation, tax treatment of the Settlement Check, and the scope of the release. *See* Ex. 3, Notice

Packet. If a Settlement Collective Member does not wish to participate in the settlement, the

Notice Packet advises the individual to simply not cash the Settlement Check. Ex. 2, ¶ 16(m).[2]

Prior to mailing the Notice Packet and Settlement Checks, the Stipulation and Settlement

Agreement requires Belk to provide the Claims Administrator and Plaintiffs' Counsel the last

known addresses, last known e-mail addresses, last known telephone number, and location

worked for each Settlement Collective Member, along with each Settlement Collective

Member's social security number, which will be used by the Claims Administrator solely for

purposes of locating individuals if a Settlement Check is returned as undeliverable and for tax

purposes. Ex. 2, ¶ 16(f).  Belk will also provide the Claims Administrator and Plaintiffs' Counsel

with the respective dates of employment wherein the Settlement Collective member worked as a

STM during the relevant time period.   If any mailing of the Notice Packet and Settlement

Check(s) is returned to the Claims Administrator as undeliverable, the Stipulation and Settlement

Agreement requires the Claims Administrator to perform an entry level skip trace and resend the

Notice Packet and Settlement Check(s) based on the new address obtained. (Ex. 1, ¶¶ 16(g) and

16(n)).

      E.     **Attorneys' Fees and Litigation Costs**

Under the Stipulation and Settlement Agreement, and subject to Court approval,

Plaintiffs' Counsel seeks ███████████ in attorneys' fees, plus reimbursement of ██████████ in

out-of-pocket costs and expenses incurred in litigating and resolving this matter. Ex. 2, ¶ 16(a).

This includes the fees and costs of the Claims Administrator, Rust Consulting, Inc. Subject to the

Court's approval, the Claims Administrator's fee will be paid with the settlement monies

---

[2] Individuals not cashing their Settlement Checks will not be bound by the release of claims, as detailed in Paragraph 16.  In Plaintiffs' Counsel's experience, where checks are mailed with the notice of settlement, few (if any) check recipients decline to cash their settlement checks.

included under the reimbursement of costs detailed in the Stipulation and Settlement Agreement. The attorneys' fees and costs incurred are set forth per the ledger in the Declarations of Plaintiffs' Counsel attached hereto as **Exhibit 4**, Plaintiffs' counsel spent over 3,707 hours prosecuting this case and have an actual lodestar in excess of $1,900,000.00 in fees.  To facilitate a settlement of the Halleen Litigation, Plaintiffs' Counsel agreed to write off █ of actual time and fees and anticipate writing off over ████ in expenses incurred.  The amount of times and fees written off does not include the additional time and fees Plaintiffs' Counsel will expend through the end of the administration of this settlement.  Thus, the requested fees and costs award is significantly below Plaintiffs' Counsel's lodestar and is presumably reasonable.

## ARGUMENT

## IV.   THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

The decision to approve a class action settlement is left to the district court's sound discretion. *Lee v. Metrocare Servs.*, 2015 WL 13729679, at *1 (N.D. Tex. July 1, 2015) (citing *Newby v. Enron Corp.*, 394 F.3d 296, 300 (5th Cir. 2004)). In many FLSA actions in the Fifth Circuit and throughout the country, a one-step approval process is appropriate in FLSA settlements that do not include Rule 23 classes. *See e.g. Id; Jones v. JGC Dallas LLC*, 2014 WL 7332551, at *2 (N.D. Tex. Nov. 12, 2014). Collective actions under Section 216(b) require workers to affirmatively opt-in to the litigation, unlike in a Federal Rules of Civil Procedure 23 class action. *Id*.

Under the FLSA, "Parties may elect to opt in but a failure to do so does not prevent them from bringing their own suits at a later day." *McKenna v. Champion Int'l Corp.*, 747 F.2d 1211, 1213 (8th Circ. 1984), abrogated on other grounds by *Hoffmann-LaRoche Inc. v. Sperling,* 493 U.S. 165 (1989). Accordingly, courts do not apply the exacting standards for approval of a class

action settlement under Rule 23 to FLSA settlements. *See e.g. Jones,* 2014 WL 7332551, at *2; *Sims v. Hous. Auth. City of El Paso*, 2012 WL 10862119, at *2 (W.D. Tex. Feb. 29, 2012). The approval process of Section 216(b) does not include a mechanism for collective members to object to the terms of the settlement, but as set forth below, the Parties seek to provide Notice and Opt-In Plaintiffs have the opportunity to reject their proposed settlement.

Unlike Rule 23, Section 216(b) does not require the standard preliminary approval proceedings, fairness hearings and final approval proceedings. *See Jones,* 2014 WL 7332551 at *3. Still, the Court has a duty to determine whether the proposed settlement is i) a fair and reasonable resolution of ii) a bona fide dispute over FLSA provisions. *Id.*at *2 (citing *Lynn's Food Stores, Inc. v. United States, U.S. Dep't of Labor,* 679 F.2d 350, 1353 (11th Cir.1982)); *Sims,* 2012 WL 10862119 at *2. Courts approve wage and hour settlements when they are reached as a result of contested litigation to resolve bona fide disputes. *Id.* If the proposed settlement reflects a reasonable compromise over contested issues, the Court should approve the settlement. *Lynn's Food Stores, Inc.,* 679 F.2d 350 at 1353. It is a well settled principle that "[p]articularly in class action suits, there is an overriding public interest in favor of settlement". *See Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977).

**A.     Bona Fide Dispute**

The settlement occurred only after years of lengthy, costly and time-consuming litigation and after the Parties engaged in extensive and contentious motion and deposition practice. During the entire process, Plaintiffs and Belk were represented by counsel experienced in wage and hour law. The settlement was the result of arm's length negotiations.

The procedural evolution of cases can demonstrate the existence of a bona fide dispute. *See, e.g.*, *Jones*, 2014 WL 7332551, at *3*; Rodriguez v. Stage 3 Separation, LLC,* 2015

WL 12866212, at *2 (W.D. Tex. Dec. 23, 2015). Here, Plaintiffs amended their complaint, asserting that Defendant misclassified them as exempt employees under the FLSA and did not pay them overtime wages for hours worked over 40. (Dkt. Nos. 1 and 2.). Defendant answered the amended complaint and asserted affirmative defenses, disputing, among other things, collective treatment; Plaintiffs' claim that STMs were incorrectly classified as exempt under the FLSA; the alleged amount of damages suffered by each Plaintiff; whether liquidated damages were appropriate; and the appropriate statute of limitations. (Dkt. No. 14).

Thereafter, the Parties engaged in years of discovery, including depositions, and both interrogatories and the production of nearly one million pages of documents and Electronically Stored Information ("ESI"), including policy documents, emails, personnel records, payroll data, training materials, schedules, internal studies, and complete systems and databases that Plaintiffs requested. The Parties conferred extensively on ESI issues, including in-person conferences to confer about the scope and procedures for producing ESI. The Parties have also engaged in extensive motion practice before this Court and participated in a full day mediation session in Dallas, Texas.

Recognizing the uncertain legal and factual issues involved, the Parties reached the settlement pending before the Court. In short, this long-fought case reflects a bonafide dispute in a contested litigation, and as such, the settlement enjoys a presumption of fairness. *See Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1353 (11th Cir. 1982); *Escalante v. STX Process Equip., LLC,* No. C-11-53 (S.D. Tex. Aug. 3, 2011) ("Where a settlement in an FLSA case reflects a reasonable compromise over issues in dispute, a court should approve the settlement in order to promote the policy of encouraging settlement of litigation.") (internal citations omitted); *Sims,* 2012 WL 10862119, at *3 (finding a bona fide dispute existed as a

result of the filings, documentation, hearings, discovery and motions in a FLSA collective action); *Vassallo v. Goodman Networks, Inc.,* 2016 WL 6037847, at *1 (E.D. Tex. Oct. 14, 2016) (finding a bonafide dispute existed when the Parties disputed whether the plaintiffs were correctly classified as exempt under the FLSA).

**B.     The Settlement is a Fair and Reasonable Resolution**

As a framework for determining what is fair and reasonable, courts in the Fifth Circuit consider the following factors in evaluating the fairness of a class action settlement:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Jones,* 2014 WL 7332551, at *4 (*citing Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982)); *Sims,* 2012 WL 10862119, at *3–4 (citing *Reed v. Gen. Motors Corp*., 703 F.2d 170, 172 (5th Cir. 1983)). When considering these factors, the Court also should keep in mind the presumption in favor of finding a settlement fair and the overriding public interest in favor of settlement. *Lee v. Metrocare Servs*., 2015 WL 13729679, at *3 (N.D. Tex. July 1, 2015) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)).

i.     There is No Fraud or Collusion Behind the Settlement

"The Court may presume that no fraud or collusion occurred between counsel in the absence of any evidence to the contrary." *Lee v. Metrocare Servs.,* 2015 WL 13729679, at *5 (N.D. Tex. July 1, 2015); *Jones v. JGC Dallas LLC*, 2014 WL 7332551, at *2 (N.D. Tex. Nov. 12, 2014) (finding no evidence of fraud or collusion where "the settlement agreement was a result of arms-length negotiations by experienced counsel on both sides"). Here, there is no evidence of fraud or collusion. The settlement was the result of intense adversarial arm's length

negotiations that took place after detailed investigation, years-long discovery involving the production of nearly one million documents, nineteen (19) depositions, vigorous motion practice and weeks of hard negotiations in finalizing the settlement agreement. Attorneys on both sides are experienced and specialize in wage and hour cases. Accordingly, the settlement agreement was not a product of fraud or collusion.

ii.     Complexity, Length, and Expense of Further Litigation

A second factor to be considered by the Court is the complexity, length, and expense of litigation that will be spared by the proposed settlement. "When the prospect of ongoing litigation threatens to impose high costs of time and money on the Parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Vassallo v. Goodman Networks, Inc.,* 2016 WL 6037847, at *2 (E.D. Tex. Oct. 14, 2016). This case is a complex, collective action that carried significant risks for the Parties as to both legal and factual issues. The Parties agreed to settle the case in order to avoid the burden, expense, and uncertainty of litigating Plaintiffs' claims. Here, absent settlement, Plaintiffs would be required to incur the time and expense of remaining fact depositions and discovery. This includes deposing many of the Defendant's 111 disclosed witnesses and reviewing terabytes of data that Defendant was processing and producing. (Dkt. Nos. 154, 162).  Defendant would be required to incur the cost of producing and reviewing terabytes of ESI, preparing their witnesses for depositions and taking depositions of additional discovery opt-in plaintiffs.  Thereafter, the Parties would be required to prepare for the burden and expense of motions to decertify the entire collective or, in the alternative, large groups and swaths of Opt-in Plaintiffs.  (Dkt. No. 88).

There is also no question that litigating the case to trial would require substantial time and expenses in addition to that already expended. Trial was imminent, with the case previously

set to commence trial on the Court's docket beginning January 7, 2019. (Dkt. No. 99).  A trial to be conducted relating to the claims of hundreds of Opt-in Plaintiffs and the defenses raised by Defendant with respect to the collective poses its own set of complexities, ranging from various legal and factual issues and proof issues, but also to coordinating testifying Opt-ins from states across the country. Post-trial litigation, including appeals, would be a near certainty. It is safe to assume that trial preparation, trial and post-trial litigation would consume years of more effort and expense before there would be finality in this litigation that dates back to 2016. (Dkt. No. 1). Thus, additional litigation undoubtedly would increase the expenses and complexity of this litigation.

iii.    <u>The Stage of the Proceeding and Amount of Discovery Completed</u>

The goal of the third factor – the stage of the proceedings and the amount of discovery – is to "evaluate whether 'the Parties and the district court possess ample information with which to evaluate the merits of the competing positions.'" *Vassallo v. Goodman Networks, Inc.,* 2016 WL 6037847, at *2 (E.D. Tex. Oct. 14, 2016). This case was resolved only after nearly three years of hard fought and intense litigation. The Parties responded to several sets of interrogatories and document production requests, conducted approximately 19 depositions (including discovery opt-in plaintiffs and a third-party former Regional Vice President of Belk), and exchanged approximately one million documents (including Belk's production of policy documents, emails for corporate personnel and Opt-Ins, personnel records, payroll data, internal studies, and complete data systems and databases requested by Plaintiffs). Thus, the Parties have had the opportunity to fully and fairly evaluate the merits of their respective positions, and this factor favors approval of the settlement.

iv.     The Probability of Plaintiffs' Success on the Merits

Plaintiffs remain steadfast about the validity and merits of their claims. However, they acknowledge that risks remain regarding whether they ultimately will prevail on those claims. Those risks include defeating decertification motions, succeeding at the liability and damages phases of trial and post-trial motions, and succeeding on Defendant's inevitable appeal to the Fifth Circuit and beyond.  *Jones,* 2014 WL 7332551, at *4 (approving a FLSA collective settlement agreement when the issue of decertification was avoided because of the settlement).

a.     *Decertification*

There was a risk that Defendant would succeed on a motion for decertification, which it was prepared to file by the November 1, 2018 deadline. (Dkt. Nos. 88 and 168). The Opt-in Plaintiffs worked as STMs in 16 different states and over 160 different stores. Belk asserts that its stores vary by size, sales volume, architecture, clientele, and staff, which directly impact the Opt-In's job duties.  Belk also asserts that the Opt-in Plaintiffs managed one or more different departments at different periods of time during the recovery period which impacted and largely informed their job duties (for example, Belk asserts that while an Opt-in Plaintiff in the Home Department manages bridal registries on a daily basis and oversees significant and various promotional events coordinated with wedding-related vendors, an Opt-in Plaintiff in the Children's Department performs very different duties and functions focused on kids).

Belk also asserts that the Opt-in Plaintiffs each exercised independent judgment in managing his/her department(s); thus, Opt-in Plaintiffs in different departments, even at the same store, completed tasks differently – using their own independent judgment. For example, how each Opt-in chose to drive his/her department's business and hire, train, and coach his/her sales associates, was based on each Opt-in Plaintiff's independent judgment and analysis of the

business needs of his/her specific department. Thus, Belk would have asserted that decertification is appropriate because of the claimed factual disparity of the Opt-in Plaintiffs' claims and the separate proof necessary to establish whether, why, and how the Opt-in Plaintiffs performed their job duties. *See Proctor v. Allsups Convenience Stores, Inc.,* 250 F.R.D. 278, 282 (N.D. Tex. 2008).

  b.  *Trial*

If the Opt-In Plaintiffs had defeated a motion for decertification, there was the inevitable risk that Belk would succeed at trial. First, Plaintiffs would have to establish liability at trial. Even if Plaintiffs brought Opt-in Plaintiffs from various states to testify at the liability phase of trial, they still faced many risks associated with various defenses raised by Belk.  For example, Belk would have argued that these witnesses cannot be representative of the experiences of hundreds of other Opt-in Plaintiffs who worked at hundreds of different locations, in different departments, and at different times during the recovery period. Additionally, Defendant would have again raised all of its defenses, including that the STMs qualified for the executive exemption under the FLSA and the *de minimus doctrine*, among others. Defendant contends that its 111 disclosed witnesses, company policies, and documents, all support the exempt classification of STMs.  Defendant also would have raised its due process arguments (as it would have at the decertification stage as well) arguing that applying the testimony of 25 testifying STMs to 384 collective members violates Defendant's due process rights because of the individualized nature of the claims and its defenses. If Plaintiffs succeeded at the liability phase, at the damages phase, Defendant would have raised arguments about individualized proof of damages.

Nonetheless, Plaintiffs would have argued that they should prevail on the merits of their claim that they were misclassified, as they contend that evidence would demonstrate that so much of their time and duties included the same duties as hourly employees, such as assisting customers, working the cash register, and merchandising.  Plaintiffs further would have argued that STMs had little or no discretion in performing any of their duties, claiming that every aspect of the stores' operations was prescribed by Belk.

*c.      Appeal*

There was also a risk that if Plaintiffs succeeded at the trial stage, Defendant would succeed on appeal. It is likely that Defendant would have appealed any adverse decertification rulings and trial rulings and findings.

v.      <u>The Range of Recovery</u>

By any objective measure, the compensation this settlement makes available to the Plaintiffs is favorable and provides the collective action members reasonable consideration for their alleged claims. The settlement brings the Plaintiffs significant monetary value, now, not years from now, and provides certainty about the outcome. Here, the Parties disputed the hours of estimated time worked by the Plaintiffs. The distribution calculations under the settlement agreement, however, are based on an equal Minimum Payment of ▮▮▮▮▮ and a proportionate settlement share of the remaining balance, which is calculated by the number of full workweeks each Opt-in worked as a STM during the relevant period (which is taken from Belk's records). (Ex. 2, ¶ 15(b)). The Parties also disagreed with whether a three-year or two-year statute of limitations applies, the application of the fluctuating workweek method of calculation, as well as whether liquidated damages would be recoverable by the Plaintiffs.  Defendant maintained that, even if Plaintiffs prevailed, Plaintiffs could not meet their burden to demonstrate that Belk's

20

conduct was willful thereby triggering a third year of liability under the FLSA.  Nonetheless, for settlement purposes only, Plaintiffs were able to secure a three-year limitations period for Settlement Collective Members. Therefore, each Plaintiff, even those with claims only in the third year of the statute of limitations, recovers money and liquidated damages under the Stipulation and Settlement Agreement. (Ex. 2, ¶ 15(b)).  Based on the average STM salary and applying the fluctuating workweek method, each Settlement Collective Member will receive approximately ███████ for each workweek they worked as an STM during the period applicable to this settlement.  This amount is equal to pay for an average of 4.15 hours of overtime per week plus liquidated damages.  Thus, not only does the settlement provide for damages going back all three years, but the parties stipulated to inclusion of liquidated damages in the settlement doubles the 4.15 hours of overtime to be paid per week.  A Settlement Collective Member, therefore, will receive 4.15 hours per week of unpaid overtime for back-pay as part of each Settlement Check, taxed as a W-2, plus 4.15 hours per week treated as liquidated damages as part of each Settlement Check, and taxed through an IRS Form 1099.

The average *net* amount payable to each Settlement Collective Member, ███████ free from further deduction for service awards, attorneys' fees or costs, compares favorably to other collective retail FLSA assistant manager misclassification claims with which Plaintiffs' Counsel are familiar.  *See, e.g. Ogaian v. Christmas Tree Shops*, No. 1:12-cv-1273 (S.D.N.Y.) (final approval obtained June 4, 2014 for $1,340,000 million for 408 class members, averaging approximately $3,284 *gross* per putative class member); *Ferreira v. Modell's Sporting Goods, Inc.*, No. 11-cv-2395) (S.D.N.Y.) (final approved obtained March, 12, 2015 for $800,000 settlement for class of 689, averaging approximately $1,161 *gross* per putative class member); *Hegab v. Family Dollar Stores Inc*, 11-cv-01206 (D.N.J.) (final approval order dated March 9, 2015 for $1.15 for 557 class members, averaging approximately $2,064 *gross* per putative class member, a result District

21

Judge Cecchi "overwhelmingly weigh[ed] in favor of approval" in her final Order); *Nash v. CVS Caremark Corp.,* 1:09-cv-00079 (D.R.I.) (assistant store manager settlement for $34 million, the average class member claimant gross recovery was $1,760, a result District Judge McConnell termed "magnificent" at the final approval hearing); *Craig v. Rite Aid Corp.*, 2013 U.S. Dist. LEXIS 2658, at *41 (M.D. Pa. Jan 7, 2013), the Rite Aid assistant store ($20.9 million total settlement averaging approximately manager case was $1,845 gross per class member); *Alli v. Boston Market Corp.*, No. 10-cv-0004 (D. Conn.) (final approval obtained April 17, 2012 for $3 million for 1,921 class members averaging approximately $1,561 gross per putative class member); *Jenkins v. Sports Authority*, No. 09-cv-224 (E.D.N.Y) (final approval obtained September 30, 2011 for $990,000 settlement for class of 559, averaging approximately $1,771 *gross* per class member).   The guarantee of payments within the next few months, rather than waiting for years of litigation and appeals, renders the value of this settlement even more compelling.

Although the maximum possible award at trial could be larger than the settlement amount, there was a significant chance it could also be lower, or non-existent. The inquiry as to whether a settlement is reasonable examines the benefits of the settlement in light of the risks of establishing liability and damages. *See e.g. Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (affirming a district court's approval of a settlement after properly comparing the settlement amount and the likely rewards the class would have received following a successful trial of the case); *Vassallo v. Goodman Networks, Inc.*, 2016 WL 6037847, at *3 (E.D. Tex. Oct. 14, 2016) (finding settlement of FLSA claims to be reasonable in light of uncertainties involved in the litigation when liability and the amount of damages were disputed by the Parties); *Tittle v. Enron Corp.*, 228 F.R.D 541 (S.D. Tex. 2005) (approving a settlement amount below the possible recovery amount). Here, all Parties believe that the settlement amount is a reasonable and fair evaluation of the Plaintiffs' claims.

vi.   <u>The Opinions of Counsel</u>

The experience of the Parties' respective counsel in litigating and negotiating complex wage and hour disputes likewise strongly favors approving the settlement. When reviewing settlement agreements, courts are "entitled to rely upon the judgment of experienced counsel for the Parties .... [and] absent fraud, collusion, or the like, [courts] should be hesitant to substitute its own judgment for that of counsel." *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977); *Jones,* 2014 WL 7332551 at *5.

This FLSA collective action had the benefit of attorneys on both sides who are highly experienced in complex litigation and familiar with the facts and law in the case, and who have negotiated settlements in other complex litigation cases, including class and collective action settlements. The terms of the settlement agreement were approved by Plaintiffs, their counsel, Belk, and Belk's counsel. Exhibit 4, Declarations of Plaintiffs' Counsel.  Plaintiffs' Counsel had an immense amount of information to evaluate, negotiate, and make well-informed judgments about the adequacy of the settlement. In lead counsel's opinion, the settlement is fair, reasonable, and adequate. *Id.* Also, in the view of Plaintiffs' Counsel, the settlement provides substantial benefits to the Plaintiffs, especially when one considers, among other things, the attendant expense, risks, difficulties, delays, and uncertainties of litigation, trial, and post-trial proceedings. *Id.* Because this settlement is fair, adequate, and eminently reasonable, it should be approved. *See Murillo*, 921 F. Supp. 443 at 445.

**V.    THE COURT SHOULD APPROVE THE NOTICE**

The Court should approve the proposed Notice Packet attached as **Exhibit 3**.   The proposed Notice Packet sufficiently informs each Settlement Collective Member of the general terms of the Stipulation and Settlement Agreement, stating the amount allocated to the Settlement Collective Member, including the Settlement Check to which they are entitled, tax

treatment of the award, the scope of the release, and how to retain their claims and not participate

in the settlement, if he/she so chooses. *Koszyk v. Country Fin. a/k/a CC Servs., Inc.*, 2016 WL

5109196, at *2 (N.D. Ill. Sept. 16, 2016) (approving class notice that, *inter alia*, described

settlement terms and individual fee allocation); *see also Bozak v. FedEx Ground Package Sys.,*

*Inc.*, No. 11 Civ. 738, 2014 WL 3778211, at *3 (D. Conn. July 31, 2014) (approving FLSA

notice providing notice of settlement terms and options facing class).

## VI.    THE ENHANCEMENT AWARDS TO PLAINTIFFS SHOULD BE APPROVED AS FAIR AND REASONABLE

In recognition of their continuous service, their assistance in prosecuting the case, their

participation in written discovery, their availability for multiple questions by counsel at

inopportune times, their participation in depositions, their assistance in preparing Plaintiffs'

Counsel for mediation and their help in the ongoing investigation of their claims, the Parties have

designated Enhancement Award Checks to the two Named Plaintiffs of up to ▮▮▮▮ each. (Ex 2,

¶ 16(b)).  In addition, the Parties have designated Enhancement Award Checks to the sixteen

other Halleen Opt-In Plaintiffs who gave deposition testimony up to ▮▮▮▮ each. (Ex 2, ¶ 16(b)).

This Enhancement Award Check compensates the Halleen Opt-in Plaintiffs who spent time and

effort assisting in the litigation by participating in full length depositions and answering

questions, attending two to three deposition preparation conferences with Plaintiffs' counsel,

providing responses to written discovery requests, and/or providing Plaintiffs' counsel with

information which significantly helped Plaintiffs' Counsel with the prosecution of this case.  In

exchange for the Enhancement Award Checks detailed in the Stipulation and Settlement

Agreement, the Enhancement Award Check recipients must execute a general release of all

claims against Belk, as detailed in Exhibit 5 to the Stipulation and Settlement Agreement.

The proposed Enhancement Award Checks are fair and reasonable. *See Lee v. Metrocare Servs.,* 2015 WL 13729679, at \*4 (N.D. Tex. July 1, 2015) ("Service awards to class representatives are permissible where they are fair and reasonable."); *In re Heartland Payment Sys.*, 851 F. Supp. 2d 1040, 1089 (S.D. Tex. 2012) (stating that courts commonly permit payment to class representatives above the amounts received by class members generally). In *Purdie et al. v. Ace Cash Express, Inc. et al.,* the Court approved $16,665 in service awards to three class representatives for "me[eting] with Class Counsel from time to time to assist in the prosecution of their cases." 2003 WL 22976611, at \*7 (N.D. Tex. Dec. 11, 2003). Further, awards, as the ones sought here, are warranted when the representatives have spent a significant amount of time assisting counsel and participating in the discovery process. *See e.g., In re Lease Oil Antitrust Litig.* (No. II), 186 F.R.D. 403, 449 (S.D. Tex. 1999) (approving awards of up to $10,000 per class representative); *Camp v. The Progressive Corp. et* al., No. 01- 2680, 2004 U.S. Dist. LEXIS 19172 (E.D. La. Sept. 23, 2004) (approving service awards to the class representatives in the amount of $10,000 each).

## VII.   ATTORNEY'S FEES AND COSTS

Pursuant to 29 U.S.C. § 216(b), the Plaintiffs are entitled to an award of reasonable attorneys' fees and expenses. In cases involving a fee-shifting statute, the Supreme Court has expressed a preference that the Parties agree to the amount of the fee: "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

Here, Plaintiffs' Counsel negotiated its attorneys' fees not be based on a percentage of the fund, but rather based on Plaintiffs' Counsel's lodestar in this litigation.  The fee agreed to by the parties is less than Plaintiffs' Counsel's "lodestar" fees of $1,910,067.00.  "The lodestar is

calculated by multiplying the number of hours an attorney reasonably spent on the case by an appropriate hourly rate, which is the market rate in the community for this work." *Black v. SettlePou, PC*, 732 F.3d 492, 502 (5th Cir. 2013) (citations omitted).   There is a strong presumption that the lodestar is a reasonable amount.  *Perdue v. Kenny A.*, 559 U.S. 542, 552, 130 S. Ct. 1662, 176 L. Ed 2d 494 (2010).

After the Court determines the lodestar, the Court must determine whether it should be adjusted based on the circumstances of the case and the factors enumerated in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-18 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 109 S. Ct. 939, 103 L. Ed. 2d 67 (1988).[3]   The application of the *Johnson* factors to this case supports the reasonableness of the attorneys' fees sought in this case.

Plaintiffs' counsel—experienced labor and employment lawyers—dedicated a substantial amount of effort, time and labor to this case.  (Ex. 4, Plaintiffs' Counsel Declarations).   Named Plaintiffs filed this case in January 2016, and since this lawsuit's inception, the litigation has been hotly contested every step of the way.   Defendant strongly disputed liability and asserted multiple defenses throughout the litigation.   The parties fought very strongly and conducted extensive briefing over key motions, such as, Defendants Motion to Transfer to the Northern District of Texas and Plaintiffs' Motion for Conditional Certification.  (*See* Dkt. Nos. 31 and 44). Following the Court's Order conditionally certifying the FLSA collective, the parties fought and fully briefed several additional motions related to subjects such as the breadth and manner of

---

[3] The factors set forth in *Johnson* are: (1) the time and labor required, [*4] (2) the novelty and difficulty of the questions, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

representative discovery, dismissal of non-responsive opt-in plaintiffs, and the sufficiency of discovery responses.

Defendant sent detailed discovery to the Halleen Opt-In Plaintiffs being deposed, including Interrogatories and Requests for Production.  Plaintiffs also served Defendant with detailed written discovery requests, which resulted in Plaintiffs' Motion to Compel.  (Dkt. No. 98, Motion to Compel).

The parties attempted mediation of this case on May 9, 2018.  While post-notice mediation after the collective is defined in FLSA cases is frequently productive, mediation proved to be of little value in this case.  Then, on August 6, 2018 the Court entered its Order granting in part Plaintiffs' Motion to Compel. (Dkt. No. 147).  What ensued were the most intense ESI and discovery battles Plaintiffs' counsel had experienced. In addition to the extensive disputes over written discovery, disputes arose during several of the 19 depositions taken in this case, some of which required the Court's intervention.

The motion practice and discovery were complex and time-consuming. Defendant produced nearly one million documents, including complex data systems, which required the retention of a third-party expert vendor to host and convert the data into a readable format. Preparing damage models also proved difficult (for example, Plaintiffs' counsel had to calculate estimates for hundreds of Settlement Collective Members, with no time-keeping records). *Id.* The litigation of this case also precluded work on other matters. *Id.*

Here, the Parties have agreed that Plaintiffs' Counsel will receive ███████ as attorneys' fees and an additional ███████ to reimburse Plaintiffs' Counsel's out-of-pocket costs.   Thus, the Court's award of attorneys' fees and costs will not reduce, diminish or otherwise compromise the ███████ in separate payments to the Settlement Collective

Members.  Rather, the attorneys' fees and costs are above and beyond the amount to be paid to the Settlement Collective Members, such that their recoveries are not reduced due to the fees and costs incurred on their behalf.

The total lodestar to date for the work performed by the two law firms representing the Settlement Collective Members in this case is $1,910,067.00 for 3707.7 hours of attorney and paralegal time spent prosecuting this case.  (Ex. 4, Plaintiffs' Counsel Declarations).   The following chart is a summary of the time and effort invested by Plaintiffs' Counsel:

| Attorney | Rate[4] | Hours | Total |
|---|---|---|---|
| Joshua Cittadino (HGR) | $330 | 133.0 | $43,890.00 |
| Christine Duignan (SLG) | $550 | 48.6 | $26,730.00 |
| Charles Gershbaum (HGR) | $600 | 231.5 | $138,900.00 |
| Marc Hepworth (HGR) | $600 | 569.1 | $341,460.00 |
| Camar Jones (SLG) | $520 | 57.6 | $29,952.00 |
| Janine Kapp (HGR) | $330 | 61.3 | $20,229.00 |
| Paolo Meireles (SLG) | $500 | 154.7 | $77,350.00 |
| Logan Pardell (SLG) | $330 | 142.5 | $47,025.00 |
| Rebecca Predovan (HGR) | $465 | 410.0 | $190,650.00 |
| Alan Quiles (SLG) | $550 | 803.4 | $441,871.00 |
| David Roth (HGR) | $600 | 677.1 | $406,260.00 |
| Gregg Shavitz (SLG) | $600 | 202.8 | $121,680.00 |
| Melissa Young (HGR) | $250 | 16.4 | $4,100.00 |
| Paralegals | $100 | 199.7 | $19,970.00 |

[4] Plaintiffs' Counsel's rates stated herein are lower than the rates they customarily charge in representative collective and class wage and hour litigation cases and for which they have been approved in other courts, and have been reduced to reflect reasonable customary rates charged by other attorneys in Texas for similar representation.

**TOTAL LODESTAR FEES**          3,707.7              **$1,910,067.00**

This reflects the time actually spent, in the exercise of reasonable judgment by the lawyers and staff involved and is reflected in the detailed time records for each of the firms. The work undertaken represents the work addressed above in connection with the investigation and filing of the lawsuit, the work undertaken in conjunction with the discovery in the case and the work involved in negotiating and effectuating the settlement. Each of the firms involved in the case has expertise and knowledge with respect to aspects of the litigation, including extensive and successful records in class action and wage hour litigation. *Id.* The firms also communicated regularly so as to ensure that there was not unnecessary time incurred, nor duplication of effort. As outlined above, the time and labor required in the prosecution of this case was substantial, considering the extensive discovery and complex motion practice involved.

The hourly rates Plaintiffs' counsel seeks are reasonable considering the expertise of counsel and their familiarity and experience in FLSA collective action litigation. (Ex. 4, Plaintiffs' Counsel Declaration). Plaintiffs' Counsel agreed to represent Plaintiffs on a contingency fee basis, and thus Counsel bore the risk of non-payment for the significant time expended. The result obtained represents recovery of a substantial amount of the overtime wages claimed, and the separate attorneys' fee does not reduce the Settlement Collective Members' recovery. By the time the administration of this settlement is completed, the duration of this suit and Plaintiffs' Counsel's relationship with the Plaintiffs will exceed three years.

Plaintiffs' counsel's request for payment of fees in the amount of ███████ represents a negative multiplier of ██. Given the risks presented by this Lawsuit and the results obtained, the fee requested is decidedly reasonable. Based on our experience, we also expect that there will be significant future time spent by Plaintiffs' counsel in administering the claims

29

process and the settlement, resolving issues with the Settlement Claims Administrator and Defendants' counsel, and speaking with Settlement Group Members about the administration and the Settlement, bringing the multiplier even further below one.  Defendants do not oppose the amount of attorneys' fees and costs as set forth in the Parties' Agreement.

The settlement of attorneys' fees and costs was negotiated as a payment that would be separate and apart from the amount payable to Settlement Collective Members. *See Daniels v. Prod. Mgmt. Indus., LLC*, 2018 U.S. Dist. LEXIS 76933, *10-11 (W.D. La. April 20, 2018) (approving attorney fees in FLSA case as reasonable where they are paid separate and apart from the damages to plaintiffs and do not otherwise reduce the payment to plaintiffs).  "The lodestar . . . is presumptively reasonable and should be modified only in exceptional cases." *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir.1993).  Accordingly, Plaintiffs' request for attorneys' fees and costs should be approved.  Detailed, reasonable, and necessary billing entries will be made available to the Court *in camera* should the Court so request. So, the time worked in the case alone demonstrates the reasonableness of the fee and expenses requested as part of the Settlement Agreement.

In addition to the attorneys' fees sought above, Plaintiffs' Counsel seeks reimbursement of its out-of-pocket expenses in the amount of ▮▮▮▮▮▮  Like the attorneys' fee award, the amount sought is less than the costs and expenses actually incurred and anticipated in this litigation.  Overall, Plaintiffs' Counsel incurred a total of $130,776.85 in actual and anticipated out-of-pocket costs and expenses, summarized in the chart below:

| | |
|---|---|
| Filing and Court Fees | $1,100.00 |
| Service of Process | $75.00 |
| Court Reporter, Transcript and Video Deposition Fees | $23,313.85 |

| | |
|---|---|
| Travel for Depositions, Hearings and Mediation | $48,265.03 |
| ESI Storage and Administration | $2,333.23 |
| Postage/Express Mail | $1,904.74 |
| Notice of Lawsuit to nearly 1,800 STMs (Rust Consulting) | $24,000.00 |
| Anticipated Settlement Administration (per quote from Rust Consulting) | $25,000.00 |
| Mediation Costs | $4,785.00 |
| **Total:** | **$130,776.85** |

The expenses incurred in the prosecution of this case are reflected on the books and records of Plaintiffs' counsel, which are summarized in the Declarations of Gregg Shavitz and Marc Hepworth attached as Ex. 4.  The costs described are accurate regarding all the expenses incurred; and constitute hard, out-of-pocket monetary expenses from the beginning of the case. Plaintiffs' counsel was aware such costs and expenses might not be recovered and, at the very least, would not be recovered until the litigation was successfully resolved.  In seeking only ███████ in out-of-pocket expenses, Plaintiff's Counsel has agreed to forego reimbursement of ██████ in actual costs.

## VIII.   CONCLUSION

The Settlement is fair and reasonable, and the Court should approve the Stipulation and Settlement Agreement, and enter the requested Stipulated Judgment.

WHEREFORE, the Parties pray the Court approve the Settlement as requested, and enter a Stipulated Judgment directing consummation of the Settlement Agreement and dismiss the case with prejudice.

Respectfully submitted and consented to,

By: _/s/ Alan L. Quiles_

    Alan L. Quiles

Marc S. Hepworth
Rebecca S. Predovan
Charles Gershbaum
David A. Roth

Hepworth Gershbaum & Roth, PLLC
192 Lexington Avenue, Suite 802
New York, NY  10016
Telephone: 212.545.1199
Facsimile: 212.532.3801
rpredovan@hgrlawyers.com
cgershbaum@hgrlawyers.com
droth@hgrlawyers.com
mhepworth@hgrlawyers.com

Gregg I. Shavitz
Logan A. Pardell
Paolo C. Meireles
Alan Luis Quiles

Shavitz Law Group, PA
951 Yamato Road, Suite 285
Boca Raton, FL  33431
Telephone: 561.447.8888
Facsimile: 561.447-8831
gshavitz@shavitzlaw.com
lpardell@shavitzlaw.com
pmeireles@shavitzlaw.com
aquiles@shavitzlaw.com

***Attorneys for Plaintiffs***
***Hope Halleen and Donna Maner***

Dated: November 20, 2018

Respectfully submitted and consented to,

By: _/s/ John A. Ybarra_

    John A. Ybarra

John A. Ybarra
Amy S. Ramsey
Kathleen A. Barrett
Matthew J. Ruza
*Admitted Pro Hac Vice*

Littler Mendelson, P.C.
A Professional Corporation
321 N. Clark Street, Suite 1000
Chicago, IL 60654
Tel: 312-372-5520
Fax: 312-372-7880
jybarra@littler.com
aramsey@littler.com
kabarrett@littler.com
mruza@littler.com

Kimberly R. Miers
Texas State Bar No. 24041482
Littler Mendelson, P.C.
A Professional Corporation
100 Congress Avenue, Suite 1400
Austin, Texas 78701
512.982.7250
512.982.7248 (Fax)
kmiers@littler.com

***Attorneys for Defendant Belk, Inc.***

Dated: November 19, 2018

## CERTIFICATE OF SERVICE

I, John A. Ybarra, an attorney, certify that, on November 20, 2018, I filed the foregoing document with the clerk of the court for the United States District Court for the Eastern District of Texas, using the electronic case filing system of the court and that I caused a copy of the foregoing to be served upon the attorneys of record listed below via U.S. Mail on October 9, 2018:

Marc S. Hepworth
Rebecca S. Predovan
Charles Gershbaum
David A. Roth
HEPWORTH GERSHBAUM & ROTH, PLLC
192 Lexington Avenue, Suite 802
New York, NY  10016
Telephone: 212.545.1199
Facsimile: 212.532.3801
rpredovan@hgrlawyers.com
cgershbaum@hgrlawyers.com
droth@hgrlawyers.com
mhepworth@hgrlawyers.com

***Attorneys for Plaintiffs Hope Halleen and Donna Maner***

Gregg I. Shavitz
Logan A. Pardell
Paolo C. Meireles
Alan Luis Quiles
SHAVITZ LAW GROUP, PA
951 Yamato Road, Suite 285
Boca Raton, FL  33431
Telephone: 561.447.8888
Facsimile: 561.447-8831
gshavitz@shavitzlaw.com
lpardell@shavitzlaw.com
pmeireles@shavitzlaw.com
aquiles@shavitzlaw.com

***Attorneys for Plaintiffs Hope Halleen and Donna Maner***

/s/ John A. Ybarra
John A. Ybarra

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **Hope Halleen and Donna Maner, individually and on behalf of all other similarly situated,** | |
| **Plaintiffs,** | **Civil Action No. 4:16-cv-00055-ALM** |
| **v.** | |
| **BELK, INC.,** | |
| **Defendant.** | |

## AGREED STIPULATED JUDGMENT AND DISMISSAL ORDER

In this action, Hope Halleen and Donna Matter, individually and on behalf of all Plaintiffs who have executed and filed consents to opt into this litigation ("the Plaintiffs"), bring suit against Defendant, Belk, Inc. ("the Defendant," and collectively with the Plaintiffs, the "Parties") for violation of the Fair Labor Standards Act, 29 U.S.C. §201 et seq. Before the Court is the parties' Joint Motion for Leave to File Confidential Settlement Agreement Under Seal, Joint Motion for Approval of FLSA Collective Action Settlement, and Joint Memorandum of Law in Support of FLSA Collective Action Settlement. The Court has reviewed these documents and finds that all matters and disputes between the parties have been fully and finally compromised and settled.

IT IS, THEREFORE, ORDERED:

(1)     The Parties Stipulation and Settlement Agreement is APPROVED.

(2)     This lawsuit is hereby DISMISSED WITH PREJUDICE as to the claims asserted, or which could have been asserted, by all Plaintiffs against Defendant.

This Order is final as to all claims and all parties in this action.

DONE AND ORDERED in Chambers In the Eastern District of Texas.

**AGREED:**

By:  *s/Alan L. Quiles*
     Alan L. Quiles

Marc S. Hepworth
Rebecca S. Predovan
Charles Gershbaum
David A. Roth

Hepworth Gershbaum & Roth, PLLC
192 Lexington Avenue, Suite 802
New York, NY  10016
Telephone: 212.545.1199
Facsimile: 212.532.3801
rpredovan@hgrlawyers.com
cgershbaum@hgrlawyers.com
droth@hgrlawyers.com
mhepworth@hgrlawyers.com

Gregg I. Shavitz
Logan A. Pardell
Paolo C. Meireles
Alan Luis Quiles

Shavitz Law Group, PA
1515 S. Federal Highway, Suite 404
Boca Raton, FL  33432
Telephone: 561.447.8888
Facsimile: 561.447-8831
gshavitz@shavitzlaw.com
lpardell@shavitzlaw.com
pmeireles@shavitzlaw.com
aquiles@shavitzlaw.com

***Attorneys for Plaintiffs***
***Hope Halleen and Donna Maner***

Dated: November 20, 2018

**AGREED:**

By:  */s/ John A. Ybarra*
     John A. Ybarra

John A. Ybarra
Amy S. Ramsey
Kathleen A. Barrett
Matthew J. Ruza
*Admitted Pro Hac Vice*

Littler Mendelson, P.C.
A Professional Corporation
321 N. Clark Street, Suite 1000
Chicago, IL 60654
Tel: 312-372-5520
Fax: 312-372-7880
jybarra@littler.com
aramsey@littler.com
kabarrett@littler.com
mruza@littler.com

Kimberly R. Miers
Texas State Bar No. 24041482
Littler Mendelson, P.C.
A Professional Corporation
100 Congress Avenue, Suite 1400
Austin, Texas 78701
512.982.7250
512.982.7248 (Fax)
kmiers@littler.com

***Attorneys for Defendant Belk, Inc.***

Dated: November 20, 2018

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| **Hope Halleen and Donna Maner, individually and on behalf of all others similarly situated,** | |
| **Plaintiffs,** | **Civil Action No. 4:16-cv-00055-ALM** |
| **v.** | |
| **BELK, INC.,** | |
| **Defendant.** | |

**OFFICIAL COURT NOTICE OF SETTLEMENT**

To:

[Name]
[Address]
[City, State Zip]

**You previously joined the lawsuit identified above (the "Lawsuit" or "Halleen Litigation"). Recently, the United States District Court for the Eastern District of Texas approved a settlement of the Lawsuit and authorized this Notice.**

**A settlement check payable to you is enclosed.  Please read this entire Notice before signing and cashing the check.**

- This Notice is directed to any individual who was employed by Belk, Inc. ("Defendant" or "Belk") and previously opted-in to this lawsuit by filing a consent to join the action prior to February 1, 2017.

- The two Named Plaintiffs identified in the caption are former Sales Team Managers ("STMs") who sued Belk alleging that it misclassified them as exempt and failed to pay them and other STMs for overtime hours they worked.  The Named Plaintiffs filed the lawsuit as a collective action under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and 384 individuals joined the Lawsuit.

- Belk has denied the Plaintiffs' allegations and asserts that STMs were compensated correctly under federal and state wage and hour laws.  Belk also contended that the

Litigation was not suitable for collective action treatment as there were considerable differences amongst the individuals who opted to participate in the case.   Nevertheless, the Parties have agreed to settle this dispute for the purpose of avoiding further disputes and litigation with its attendant risk, expense, and inconvenience.  The Court has not made any ruling on the merits of the claims and no Party has prevailed in this action. However, the Court has reviewed and approved the settlement and this Notice.

- The settlement monies are being used to pay current and former employees who were employed as STMs during the Eligibility Period and who opted in to the Lawsuit and desire to join the settlement and to pay attorneys' fees, enhancement awards, litigation costs, payroll taxes, including employer-side payroll taxes, and the expense of administering the settlement.

- Belk will not take an adverse employment action against any eligible STM who accepts a settlement payment as the law prohibits any such retaliation.

- Under the allocation formula created by the settlement, you are entitled to the enclosed gross settlement payment of $_____, half of which is subject to deductions for applicable taxes and withholding like any other paycheck, and for which you will receive a W-2, and half of which will be reported on IRS Form 1099.  This amount is based on each opt-in plaintiff receiving a minimum of $200.00, plus an additional amount based on the number of weeks in which you worked as an STM during the period beginning three years prior to the filing of your Consent to Join form and ending on November 5, 2018 (the "Eligibility Period"). Neither Collective Counsel nor Belk make any representations concerning the tax consequences of your settlement payment.

## BASIC INFORMATION

| 1.  Why Is There a Settlement and Who Is Covered? |
| --- |

The Named Plaintiffs and your attorneys believe that this settlement is a good outcome for all individuals who decided to opt-in to the Lawsuit.  This Notice is to inform you of the relevant terms of the settlement agreement entered into by the parties and your rights under it.  Because your rights will be affected by the settlement, **it is extremely important that you read this Notice Packet carefully**.

## THE SETTLEMENT BENEFITS – WHAT YOU GET

| 2.  What Does the Settlement Provide? |
| --- |

The settlement fully resolves and satisfies any claims for attorneys' fees and costs approved by the Court, all amounts to be paid to individuals who opt-in to the Lawsuit and settlement, any Court-approved enhancement awards, interest, payroll taxes, and the settlement administrator's fees and costs. Your settlement check will have an issuance date on it. The settlement check will be valid for 120 calendar-days and you will have 120 calendar-days from that date to cash your

check. Settlement checks that are not cashed within this time on or before [120 calendar days after the original issuance check date] will be deemed null and void.

## HOW YOU GET A PAYMENT

**3.  How Do I Get My Payment?**

A check is enclosed.  All you have to do is sign and cash the settlement check.  The release of claims described in the following paragraph of this notice is also included above the signature line on the back of the settlement check.  To negotiate the settlement check, you must sign the back of the check, thereby agreeing to the terms of the release described in this notice and printed on the back of the settlement check.

**4.  What Am I Giving Up By Virtue of the Settlement?**

Pursuant to the settlement, you release any and all wage and hour claims you have or may have for the period from January 1, 2013 to [insert date that is the earlier of the date of the Court's approval or January 15, 2019], that were brought or could have been brought in the lawsuit against Belk, Inc. and its affiliates, parents, subsidiaries, predecessors, successors, officer, directors, employees and agents, under federal or state wage and hour statutory or common law. If you do not wish to release these claims and prefer to withdraw from the settlement, do not cash, deposit, or in any way negotiate the enclosed settlement check; however, the attorneys representing the STMs in this settlement will no longer be able to represent you in relation to any claim you may have against Belk.

## THE LAWYERS REPRESENTING YOU

**5.  How Will the Lawyers Be Paid?**

Court has approved payment to Collective Counsel below of $1,275,000.00 for attorneys' fees based on all the time worked on this case since its filing in January, 2016.  These fees compensate Collective Counsel for investigating the facts, litigating the case and negotiating and finalizing the settlement.  The Court also has approved reimbursement of $125,000.00 towards Collective Counsel's out-of-pocket costs.  The Court has also approved payment of the costs of the settlement administrator.

## FOR MORE INFORMATION

**6.  Are There More Details About the Settlement?**

This Notice summarizes the settlement.  More details are in the settlement agreement. To the extent there is any inconsistency between this Notice and the settlement agreement, the provisions in the settlement agreement control.  You may obtain a copy of the settlement

agreement by sending a request, in writing, to:

**<u>Rust Administration</u>**
Belk STM Settlement
[ADDRESS LINE ONE]
[ADDRESS LINE TWO]
Facsimile: (XXX) XXX-XXXX
Email: XXX@XXXX.com

## 7.  How Do I Get More Information?

If you have other questions about the settlement, you can contact the settlement administrator or Collective Counsel at the addresses and/or telephone numbers below.

Gregg I. Shavitz
Alan L. Quiles
Shavitz Law Group, P.A.,
951 Yamato Road, Suite 285
Boca Raton, Florida 33432
(561) 447-8888
(561) 447-8831 (facsimile)
info@shavitzlaw.com

Marc S. Hepworth
Hepworth Gershbaum & Roth, PLLC
192 Lexington Avenue, Suite 802
New York, NY 10016
T - 212-545-1199
F - 212-532-3801
MHepworth@HGRLawyers.com

DATED: _____, 2018

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| Hope Halleen and Donna Maner, individually and on behalf of all others similarly situated, | |
| **Plaintiffs,** | Civil Action No. 4:16-cv-00055-ALM |
| **v.** | |
| **BELK, INC.,** | |
| **Defendant.** | |

## OFFICIAL COURT NOTICE OF SETTLEMENT

To:

[Name]
[Address]
[City, State Zip]

**You previously joined the lawsuit identified above (the "Lawsuit" or "Halleen Litigation"). Recently, the United States District Court for the Eastern District of Texas approved a settlement of the Lawsuit and authorized this Notice.**

**A settlement check payable to you is enclosed.  Please read this entire Notice before signing and cashing the check.**

**In addition, you are eligible for a second check (the "Enhancement Award Check") because you are a named Plaintiff or because you sat for a deposition in this case. The directions for receiving the Enhancement Award Check are set out below.**

- This Notice is directed to any individual who was employed by Belk, Inc. ("Defendant" or "Belk") and previously opted-in to this lawsuit by filing a consent to join the action prior to February 1, 2017.

- The two Named Plaintiffs identified in the caption are former Sales Team Managers ("STMs") who sued Belk alleging that it misclassified them as exempt and failed to pay

them and other STMs for overtime hours they worked.  The Named Plaintiffs filed the lawsuit as a collective action under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and 384 individuals joined the Lawsuit.

- Belk has denied the Plaintiffs' allegations and asserts that STMs were compensated correctly under federal and state wage and hour laws.  Belk also contended that the Litigation was not suitable for collective action treatment as there were considerable differences amongst the individuals who opted to participate in the case.   Nevertheless, the Parties have agreed to settle this dispute for the purpose of avoiding further disputes and litigation with its attendant risk, expense, and inconvenience.  The Court has not made any ruling on the merits of the claims and no Party has prevailed in this action. However, the Court has reviewed and approved the settlement and this Notice.

- The settlement monies are being used to pay current and former employees who were employed as STMs during the Eligibility Period and who opted in to the Lawsuit and desire to join the settlement and to pay attorneys' fees, enhancement awards, litigation costs, payroll taxes, including employer-side payroll taxes, and the expense of administering the settlement.

- Belk will not take an adverse employment action against any eligible STM who accepts a settlement payment as the law prohibits any such retaliation.

- Under the allocation formula created by the settlement, you are entitled to the enclosed gross settlement payment of $_____, half of which is subject to deductions for applicable taxes and withholding like any other paycheck, and for which you will receive a W-2, and half of which will be reported on IRS Form 1099.  This amount is based on each opt-in plaintiff receiving a minimum of $200.00, plus an additional amount based on the number of weeks in which you worked as an STM during the period beginning three years prior to the filing of your Consent to Join form and ending on November 5, 2018 (the "Eligibility Period"). Neither Collective Counsel nor Belk make any representations concerning the tax consequences of your settlement payment.

- Because you appeared and testified at a deposition in this case and provided information to Plaintiffs' Counsel, you are also eligible for an enhancement award check in the amount of $1,000.00.  To receive that check, please follow the instructions below in the "How to get the enhancement award payment" section.

## BASIC INFORMATION

### 1.  Why Is There a Settlement and Who Is Covered?

The Named Plaintiffs and your attorneys believe that this settlement is a good outcome for all individuals who decided to opt-in to the Lawsuit.  This Notice is to inform you of the relevant terms of the settlement agreement entered into by the parties and your rights under it.  Because your rights will be affected by the settlement, **it is extremely important that you read this Notice Packet carefully**.

## THE SETTLEMENT BENEFITS – WHAT YOU GET

| **2.  What Does the Settlement Provide?** |
|---|

The settlement fully resolves and satisfies any claims for attorneys' fees and costs approved by the Court, all amounts to be paid to individuals who opt-in to the Lawsuit and settlement, any Court-approved enhancement awards, interest, payroll taxes, and the settlement administrator's fees and costs. Your settlement check will have an issuance date on it. The settlement check will be valid for 120 calendar-days and you will have 120 calendar-days from that date to cash your check. Settlement checks that are not cashed within this time on or before [120 calendar days after the original issuance check date] will be deemed null and void.

## HOW YOU GET A PAYMENT

| **3.  How Do I Get My Payment?** |
|---|

A check is enclosed.  All you have to do is sign and cash the settlement check.  The release of claims described in the following paragraph of this notice is also included above the signature line on the back of the settlement check.  To negotiate the settlement check, you must sign the back of the check, thereby agreeing to the terms of the release described in this notice and printed on the back of the settlement check.

| **4.  What Am I Giving Up By Virtue of the Settlement?** |
|---|

Pursuant to the settlement, you release any and all wage and hour claims you have or may have for the period from January 1, 2013 to [insert date that is the earlier of the date of the Court's approval or January 15, 2019], that were brought or could have been brought in the lawsuit against Belk, Inc. and its affiliates, parents, subsidiaries, predecessors, successors, officer, directors, employees and agents, under federal or state wage and hour statutory or common law. If you do not wish to release these claims and prefer to withdraw from the settlement, do not cash, deposit, or in any way negotiate the enclosed settlement check; however, the attorneys representing the STMs in this settlement will no longer be able to represent you in relation to any claim you may have against Belk.

## HOW YOU GET THE ENHANCEMENT AWARD PAYMENT

| **5.  You Are Also Eligible for an Additional Payment (the "Enhancement Award"). How Do You Get It?** |
|---|

The parties have agreed, and the Court has approved, the authorization of an additional Enhancement Award to you and those other individuals who sat for depositions and questioning in this lawsuit in the amount of $1,000.00 each.

To receive your Enhancement Award **please read the following instructions very carefully, as you will not receive your Enhancement Award if you do not follow them**. In order to receive your Enhancement Award Check, you must first review and sign the Confidential Mutual and General Release Agreement (the "General Release Agreement") attached to this Notice and return it to the Claims Administrator, Rust Consulting Inc., whose contact information is detailed at the bottom of this notice, before the Claims Administrator will send you the Enhancement Award Check.  The Claims Administrator **will not forward the Enhancement Award Check until it receives the signed General Release Agreement back from you**. Only after you have reviewed and signed the General Release Agreement, will you receive a second check that contains the Enhancement Award amount.

You should consult with your attorneys prior to executing the General Release Agreement. You will be given at least 120 days to consider the terms of General Release Agreement before signing it. You voluntarily waive the remainder of the 120-day consideration period, if any; following the date you signed the General Release Agreement. If you sign the General Release Agreement, you can change your mind and revoke it within seven (7) days after signing it by advising your attorneys in writing within such seven (7) day period.

Your Enhancement Award Check will have an issuance date on it. The Enhancement Award Check will be valid for 90 calendar-days and you will have 90 calendar-days from that date to cash your check. Enhancement Award Checks that are not cashed within this time [on or before 90 calendar days after the original issuance check date] will be deemed null and void.

Your Enhancement Award is treated as non-wage income and you are responsible to report this part of the amount you receive as income.  If you have questions about the tax consequences of the payment to you, you should consult with an accountant or other tax advisor.

## THE LAWYERS REPRESENTING YOU

### 6.  How Will the Lawyers Be Paid?

Court has approved payment to Collective Counsel below of $1,275,000.00 for attorneys' fees based on all the time worked on this case since its filing in January, 2016.   These fees compensate Collective Counsel for investigating the facts, litigating the case and negotiating and finalizing the settlement.  The Court also has approved reimbursement of $125,000.00 towards Collective Counsel's out-of-pocket costs.

## FOR MORE INFORMATION

### 7.  Are There More Details About the Settlement?

This Notice summarizes the settlement.  More details are in the settlement agreement. To the extent there is any inconsistency between this Notice and the settlement agreement, the provisions in the settlement agreement control.  You may obtain a copy of the settlement agreement by sending a request, in writing, to:

**Rust Administration**
Belk STM Settlement
[ADDRESS LINE ONE]
[ADDRESS LINE TWO]
Facsimile: (XXX) XXX-XXXX
Email: XXX@XXXX.com

## 8.  How Do I Get More Information?

If you have other questions about the settlement, you can contact the settlement administrator or Collective Counsel at the addresses and/or telephone numbers below.

Gregg I. Shavitz
Alan L. Quiles
Shavitz Law Group, P.A.,
951 Yamato Road, Suite 285
Boca Raton, Florida 33432
(561) 447-8888
(561) 447-8831 (facsimile)
info@shavitzlaw.com

Marc S. Hepworth
Hepworth Gershbaum & Roth, PLLC
192 Lexington Avenue, Suite 802
New York, NY 10016
T - 212-545-1199
F - 212-532-3801
MHepworth@HGRLawyers.com

DATED: _____, 2018

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **Hope Halleen and Donna Maner, individually and on behalf of all others similarly situated,** | |
| **Plaintiffs,** | **Civil Action No. 4:16-cv-00055-ALM** |
| **v.** | |
| **BELK, INC.,** | |
| **Defendant.** | |

### DECLARATION OF GREGG I. SHAVITZ
### IN SUPPORT OF STIPULATION AND SETTLEMENT AGREEMENT

I, Gregg I. Shavitz, hereby declare and state:

1.      I am an attorney for the Plaintiffs in *Hope Halleen, et al v. Belk, Inc.*, Case No. 4:16-cv-00055-ALM (U.S. Dist. Ct., N.D. Tex) (the "Halleen Litigation"). I submit this declaration in support of the Parties' request for approval of the Stipulation and Settlement Agreement and the allocation of settlement funds requested therein.

2.      I am a partner in the firm of the Shavitz Law Group, P.A. ("SLG") in Boca Raton, Florida.  SLG is a 7-attorney firm based in Boca Raton, Florida with an office in New York, New York that focuses on representing workers as plaintiffs in employment-related matters, including claims based upon individual and class-wide violations of state and federal wage and hour laws.  SLG was co-counsel in this case along with the law firm of Hepworth, Gershbaum & Roth PLLC ("HGR"), another firm that focuses on representing workers for class-wide violations of state and federal wage and hour laws.

3.     I am a member in good standing of the bar of the state of Florida.  I am admitted to practice *pro hac vice* in this matter.

4.     I submit this declaration to provide the Court with information concerning this litigation and SLG's relevant experience and skills.  I have personal knowledge of the matters set forth herein and would so testify if called as a witness at trial.

### LITIGATION HISTORY AND WORK PERFORMED BY SLG

5.     Litigation of this case required a substantial amount of time and labor. SLG began its investigation of the claims asserted in this case in late 2015.  Plaintiffs filed this suit on January 19, 2016 alleging that their actual day-to-day duties did not constitute exempt work under the FLSA. Specifically, Plaintiffs allege that Belk improperly classified them and other STMs as exempt employees and did not pay them overtime for hours worked over 40 hours per week.  Plaintiffs filed their Amended Complaint on January 25, 2016.

6.     The Court conditionally certified a collective of Belk STMs on September 16, 2016.   Thereafter, notice and consent forms were issued to approximately 1,793 current and former Belk STMs, and 384 individuals them opted into this litigation.

7.     The Parties engaged in years of discovery, including taking 19 depositions in several states, and extensive written discovery including interrogatories and the production directed at Plaintiffs and Defendants.   The parties exchanged nearly one million pages of documents and electronically stored information ("ESI"), including policy documents, emails, personnel records, payroll data, internal studies, training materials, schedules and complete systems and databases. The Parties conferred extensively on discovery and ESI issues, including in-person conferences to confer about the scope and procedures for producing ESI.   When conferences among counsel did not prove productive, the parties participated in conferences with

the Court on discovery and related issues.   The parties each also interviewed dozens of witnesses.

8.      The Parties have also engaged in extensive motion practice before this Court.  The parties briefed Defendants' Motion to transfer and Plaintiffs' Motion for Conditional Certification, Motions related to the scope and procedure of representative discovery, a motion to dismiss non-responsive opt-in discovery plaintiffs, a motion to compel discovery responses, and other requests for relief.

9.      The parties also participated in a full day mediation session on May 9, 2018, in Dallas, Texas with mediator William H. Lemons.   The case did not settle at mediation and litigation continued.

10.     On October 1 and October 3, 2018, Plaintiffs' Counsel noticed three additional fact witness and corporate representative depositions and was continuously reviewing the voluminous production of documents and ESI from Defendant.  Thus, substantial work remained to prepare for decertification and trial.

11.     On October 5, 2018, following extensive arms-length negotiations, the parties reached an agreement in principle on the total settlement amount.  The parties entered into a memorandum of understanding ("MOU") and informed the Court that the parties had reached an agreement.

**SETTLEMENT**

12.     SLG believes that the ▆▆▆▆▆▆ settlement for the Settlement Collective members, ▆▆▆▆▆▆ settlement of attorneys' fees, and ▆▆▆▆▆▆ for settlement of costs and expenses including administrator's charges is fair and reasonable.

13.     This settlement benefits all STMs (as defined in the settlement agreement) who opted in to this case.  There are 384 STMs covered by this settlement.

14.     This settlement represents an average net settlement of approximately ███ per STM and provides each STM with a guaranteed minimum payment of ███.  This amount is separate from any attorneys' fee or cost award, and is not subject to any deduction for service awards, attorneys' fees or costs.  The Gross Wage Payments, as detailed in the Stipulation and Settlement Agreement, pay each STM for the three-years of dispute from the date that each STM opted-into the Halleen Litigation.  Thus, Settlement Collective Members who only worked as STMs in the third year; whose claims would be barred if a jury found that Belk was not willful in its alleged violation of the FLSA; will still receive a settlement payment.  This is not a case where the benefit to the class members is merely injunctive or of modest value.

15.     Further, based on the average STM salary and applying the fluctuating workweek method, each Settlement Collective Member will receive approximately ███ for each workweek they worked as an STM during the period applicable to this settlement.  This amount is equal to pay for an average of 4.15 hours of overtime per week plus liquidated damages. Thus, not only does the settlement provide for damages going back all three years, but the parties stipulated to inclusion of liquidated damages in the settlement which doubles the 4.15 hours of overtime to be paid per week.  A Settlement Collective Member, therefore, will receive 4.15 hours per week of unpaid overtime for back-pay as part of each Settlement Check, taxed as a W-2, plus 4.15 hours per week treated as liquidated damages as part of each Settlement Check, and taxed through an IRS Form 1099.settlement figure was obtained, which will result in a substantial recovery to the class members.

16.     This amount is particularly fair given the many risks Plaintiffs faced with respect to potential decertification, proving liability, proving damages, meeting their burden to establish a three-year limitations period, and the time likely to expend on subsequent appeals.  Defendant has argued that differences among the 384 opt-in plaintiffs in support of its potential arguments in favor of decertification.   Belk has also argued that Plaintiffs have not offered sufficient evidence to establish that any FLSA violation was "willful" such that a third year of limitations would apply.   Belk has additionally developed testimony and provided evidence that STMs' salaries were not only in return for a 40-hour workweek, but rather that the fluctuating workweek method of calculating overtime was the appropriate measure of damages.  Significantly, Belk has offered evidence it contends establishes that STMs primary duties are managerial in nature, and thus Defendant's classification of STMs as exempt was proper.

17.     The distribution of settlement funds to class members is based on a damages model which includes the full workweeks that each Opt-in Plaintiff worked as a STM during the three-year period immediately preceding the date on which he or she filed their written consent to join the Halleen Litigation, to reconcile conflicting estimates of overtime hours worked.  This has proven, based on our experience, to be the fairest basis on which to distribute settlement funds.  This is because it awards the Opt-In Plaintiffs who worked the most "full workweeks" for Belk during the relevant period of time with the most money.   On the other hand, Opt-In Plaintiffs who only worked one or two "full work weeks" during the relevant period of time will not receive as large of a Settlement Check.  As stated above, each opt-in plaintiff will receive no less than ▮▮▮▮.

18.     Moreover, part of our damages model includes for the payment of Enhancement Award Checks to the Named Plaintiffs and those who provided deposition testimony.  Thus, the

Parties have designated Enhancement Award Checks to the Named Plaintiffs of up to ███

each, in recognition of their continuous service, their assistance in prosecuting the case, their

participation in written discovery, their availability for multiple questions by counsel at

inopportune times, their participation in depositions, their assistant in preparation for mediation

and their help in the ongoing investigation of their claims. Without their assistance, the FLSA

Collective Action and resulting settlement would have been far less likely. The Parties have also

designated Enhancement Award Checks to the 17 other Opt-In Plaintiffs who gave deposition

testimony of up to ███ each.   This Enhancement Award Check compensates the Opt-in

Plaintiffs who spent time and effort assisting in the litigation by preparing for depositions,

providing documents and written discovery responses, participating in full length depositions and

answering questions related to the Halleen Litigation, which significantly helped Plaintiffs'

Counsel understand the facts of this case.  Importantly, and as is customary in large scale FLSA

Collective Actions where Enhancement Award Checks are received, those individuals who

receive an Enhancement Award Checks must execute a general release of all claims against

Belk.

19.    The Parties have worked diligently throughout the last month and a half in

finalizing the terms of the Stipulation and Settlement Agreement as well as the instant motion to

the Court and the proposed scheduling dates.

**FIRM AND ATTORNEY BACKGROUND**

20.    For the past 18 years, my firm has focused on representing workers in wage and

hour matters.  SLG is nationally recognized for litigating complex class and collective wage and

hour actions.

21.    My background and those of other SLG employees who worked on this matter are

below.

22.     I am a graduate of the University of Miami School of Law in 1994 with an undergraduate degree from Tufts University in 1991.

23.     I am an experienced litigator and member of the bar of the U.S. District Court for the Southern District of Florida and the Florida Bar since 1994, and am also admitted to U.S. District Courts for the Middle and Northern Districts of Florida, the District of Colorado, the United States Eleventh Circuit Court of Appeals, and United States Third Circuit Court of Appeals.

24.     Additionally, I have lectured in the past at seminars sponsored by the Labor and Employment Section of the Florida Bar, and have spoken at the Labor and Employment Section Certification Review Seminar as well as the Academy of Florida Trial Lawyers Workhorse Seminars.  I have also been awarded Florida Trend Magazine's Legal Elite for various years including 2015 in the area of Labor & Employment law; South Florida Legal Guide – Top Lawyer – Wage and Hour law – 2009-2018; Top Lawyer Up and Comer – Wage and Hour law – 2004, 2006, and 2009; and South Florida Legal Guide – Top Lawyers List – 2009-2018; among other awards and honors.  I have also earned the distinction of Top Lawyer in Palm Beach Illustrated (2018) and am a lifelong fellow of the Florida Bar Foundation.

25.     I have held the highest AV Peer Review Rating from LexisNexis Martindale-Hubbell for preeminent attorneys from 2000 to the present.

26.     Attorney Christine M. Duignan has been an associate with SLG for over ten years.  Ms. Duignan is an employment attorney with over 25 years' experience.  Ms. Duignan provides litigation support in complex wage and hour actions arising under the Fair Labor Standards Act and Fed. R. Civ. P. Rule 23, in a variety of jurisdictions nationally.  Ms. Duignan has been a member of the Florida Bar since 1991 when she received her Juris Doctor degree with

7

high honors, from University of Florida.  She is admitted to the Florida Bar, the U.S. District Court for the Southern District of Florida, the Eleventh Circuit Court of Appeals and the U.S. Supreme Court.  Ms. Duignan did not appear of record in this case or appear at any hearings, depositions or other proceedings because she provided mostly research and drafting assistance based upon her extensive expertise.

27.     Attorney Paolo C. Meireles became an Associate Attorney with SLG in 2012, and became a Partner in January 2018.  After receiving his Juris Doctor degree from Fordham University in 2010, he was admitted to the New Jersey and New York Bars in November 2010 and February 2011, respectively.  Mr. Meireles relocated to Florida and became a member of the Florida Bar in September 2011.  Mr. Meireles is also admitted to the Second Circuit Court of Appeals and the U.S. District Courts for the Southern District of Florida, the Middle District of Florida, the Northern District of Florida, the Northern District of New York, the Southern District of New York, the District of New Jersey, the Eastern District of Michigan, the Northern District of Ohio, and the District of Colorado.

28.     Attorney Alan Quiles is an Attorney at SLG who focuses his practice in the area of employment law, specifically in the recovery of unpaid wages, overtime and minimum wages. He has 23 years of legal experience and has represented employees and employers in employment claims in State and Federal Courts since 1997. His experience includes representing clients in State and Federal discrimination claims, FLSA claims, FMLA claims, WARN Act claims, USERRA claims, OSHA, ERISA, COBRA, State minimum and unpaid wage claims, State unemployment claims, State and Federal whistleblower claims, workers' compensation retaliation claims, and HIV/AIDS claims. He has also represented employees through the EEOC and State administrative processes and represented employees in arbitration proceedings before

the NASD (now FINRA), AAA and others. He has also successfully litigated non-compete and trade secret claims. Mr. Quiles also represents clients in appellate matters at all levels of the state and federal appellate system, and has published articles on various employment law issues and presented seminars on employment law issues. Mr. Quiles graduated from Cornell University School of Law in 1995 after receiving his Bachelor of Arts in Psychology, cum laude, from the University of Houston. He is a member of the Florida and Texas State Bars and admitted to practice in the U.S. District Courts for the Southern and Eastern Districts of Texas, the District of Colorado and the Southern and Middle Districts of Florida, as well as the United States Courts of Appeals for the Eleventh Circuit. Mr. Quiles is AV-Preeminent rated by Martindale Hubble.

29.     Attorney Camar R. Jones has been an Associate with SLG since 2009. Mr. Jones has 12 years' experience litigating employment matters under state and federal anti-discrimination and wage and hour laws. Prior to joining SLG, Mr. Jones worked as an associate attorney with the Fort Lauderdale labor and employment boutique, The Amlong Firm, representing plaintiffs in discrimination, unpaid wages and FLSA claims throughout South Florida and with The Kopelowitz Ostrow Firm, PA, where he represented plaintiffs in discrimination, unpaid wages, FLSA and FMLA claims. Additionally, Mr. Jones has counseled employers on compliance with the various state and federal labor and employment laws, defended employers in claims filed by employees, and represented employers in enforcing non-compete and trade secret agreements. Mr. Jones currently represents plaintiffs in individual and collective actions in Federal Courts throughout the country. Mr. Jones received his Juris Doctor degree from Stetson University College of Law in 2003. He is admitted to the Florida Bar, the U.S. District Courts for the Southern, Middle, and Northern Districts of Florida, and the District of Colorado, as well as the Eleventh Circuit Court of Appeals. Mr. Jones is also AV-Preeminent

rated by Martindale Hubble, and has been named a "Rising Star" by Super Lawyers every year since 2013.

30.      Attorney Logan A. Pardell became an Associate Attorney with SLG in 2017.  Since joining SLG, Mr. Pardell has represented employees in in federal and state courts throughout the United States, primarily litigating complex wage and hour class and collective cases.  After receiving his Juris Doctor and Masters and Business Administration degrees, *cum laude,* from the University of Florida in 2015, Mr. Pardell was admitted to the Florida Bar in September 2015.  Mr. Pardell is also admitted to the U.S. District Courts for the Southern District of Florida and the Middle District of Florida.

31.      SLG has significant experience prosecuting wage and hour class and collective actions such as this one.  In recent years, the firm has served or been appointed as class counsel or co-class counsel in the following cases, among others:

Aboud v. Charles Schwab & Co., No. 14 Civ. 2712 (S.D.N.Y.);

Amador v. Morgan Stanley & Co, LLC, No. 11 Civ 4326 (S.D.N.Y.);

Beckman v. KeyBank, N.A., No. 12 Civ. 7836 (S.D.N.Y.);

Calabresi  v. TD Bank, N.A., No. 13 Civ. 0637 (E.D.N.Y.);

Clem v. KeyBank, N.A., No. 13 Civ. 789 (S.D.N.Y.);

Hernandez v. Merrill Lynch & Co., Inc., 11 Civ. 8472 (S.D.N.Y.);

Palacio v. E*TRADE Fin. Corp., No. 10 Civ. 4030 (S.D.N.Y);

Puglisi v. TD Bank, N.A., No. 13 Civ. 637 (E.D.N.Y.);

Robbins v. Abercrombie & Fitch Co., No. 15-cv-6187 (W.D.N.Y.);

Stewart v. Prince Telecom, et al., No. 10-civ-4881 (S.D.N.Y.);

Yuzary v. HSBC Bank USA, N.A., No. 12 Civ. 3693 (S.D.N.Y.);

Zeltser v. Merrill Lynch & Co., No. 13 Civ. 1531 (S.D.N.Y.);

Besic v. Byline Bank, Inc., et al., No. 15 C 8003 (N.D. Ill.);

Biscoe-Grey v. Sears Holding Corp., No. 09-81408-Civ-Marra / Johnson (S.D. Fla.);

Briggs v. PNC Fin. Servs. Gr., No. 15 Civ. 10447 (N.D. Ill.);

Cerrone v. KB Home Florida, LLC et al., No. 07-14402-Civ-Martinez (S.D. Fla.);

Danley v. Office Depot, Inc., et al., No. 9:14-cv-81469-KAM (S.D. Fla.);

Ellerd v. County of Los Angeles, No. CV05-1211 SVW (CWX) (C.D. Cal.);

Fiore v. Goodyear Tire & Rubber Co., No. 2:09-CV-843-FtM-29SPC (M.D. Fla.);

Hosier v. Mattress Firm, Inc., No. 10 Civ. 294 (M.D. Fla.);

Koszyk v. Country Fin., No. 16 Civ. 3571 (N.D. Ill.);

Mayfield v. Lennar Corp., No. 6:08-cv-426-Orl-31-DAB (M.D. Fla.);

McCue v. MB Fin., Inc.,No. 15 Civ. 988 (N.D. Ill.);

Nash v. CVS Caremark Corp., No. 09 Civ. 79 (D.R.I.);

Peterson v. Nelnet Diversified Solutions, LLC, No. 1:17-cv-01064 (D. Colo.);

Prena v. BMO Financial Corp., et al., No. 1:14-cv-09175 (N.D. Ill.);

Raley v. Kohl's Corporation, et al., No. 8:09-cv-2340 (M.D. Fla.);

Roberts v. TJX Cos., No. 13 Civ. 13 142 (D. Mass.);

Romero v. Florida Power & Light Company, No. 6:09-cv-1401-Orl-35-GJK (M.D. Fla.);

Rossmeisl v. A.C. Moore Arts & Crafts, No. 1:17-cv-10219 (D. Mass.);

Saliford v. Regions Financial Corp. et al., No. 10-610310-CIV-Torres (S.D. Fla.);

Simpkins v. Pulte Home Corporation, No. 6:08-cv-00130-PCF-DAB (M.D. Fla.);

Snodgrass v. Bob Evans Farms, Inc., No. 12-cv-768 (S.D. Ohio);

Stallard v. Fifth Third Bank, et al, No. 2:12-cv-01092 (W.D. Pa.);

11

Zolkos v. Scriptfleet, Inc., No. 12 Civ. 8230 (N.D. Ill.);

Waggoner v. U.S. Bancorp. et al., No. 14-cv-1626 (N.D. Ohio);

Watson v. BMO Financial Corp., et al., No. 15 cv 11881 (E.D. Ill.);

Wright v. Flagstar Bank FSB et al., No. 13 Civ. 15069 (E.D. Mi.).

**WORK PERFORMED IN CONNECTION WITH THE HALLEEN LITIGATION**

33.    SLG has represented the STMs in this litigation on a contingency basis.  SLG has litigated this matter to date without payment of any legal fees and paid all costs and expenses on behalf of its clients and the class and collective members.

34.    SLG has litigated and settled approximately 25 similar assistant-level retail manager misclassification cases and can fairly assess the risks and value of the claims in these cases as compared to other similar cases which the firm has settled.

35.    SLG ordinarily and regularly bills legal time on an hourly fee basis by the tenth of an hour, based upon each attorney's standard hourly rate.  In this matter, SLG expended 1,816.2 hours on this matter as of November 15, 2018.

36.    Currently, SLG's complex litigation rates range from $350 to $650 per hour for counsel, and $150 per hour for paralegals and legal assistants.  The rates listed below are adjusted downward to be commensurate with rates normally charged by attorneys for similar services in the jurisdiction where this matter is pending.  The adjusted rates and hours expended by each SLG attorney and paralegal are listed below:

| Timekeeper | Rate | Hours | Totals |
|---|---|---|---|
| Gregg Shavitz | $600 | 202.8 | $121,680.00 |
| Alan L. Quiles | $550 | 803.4 | $441,871.00 |
| Paolo Meireles | $500 | 154.7 | $77,350.00 |
| Camar R. Jones | $520 | 57.6 | $29,952.00 |

| | | | |
|---|---|---|---|
| Christine Duignan | $550 | 48.6 | $26,730.00 |
| Logan Pardell | $330 | 142.5 | $47,025.00 |
| Paralegals | $100 | 136.7 | $13,670.00 |
| **Totals** | | **1,546.3** | **$758,278.00** |

SLG expects to spend additional time (approximately 35 hours) on the administration of the settlement, discussing the settlement with the Plaintiffs and answering their questions, and coordinating the notice and claim form process with Defendant and the settlement administrator.

37.     Application of the "Johnson factors" listed in *Johnson v. Ha. Highway Express, Inc.,* 88 F.2d 714 (5th Cir. 1974) supports the requested fee amount. Plaintiffs' Counsel expended substantial time and labor in the case, investing over 1,546 hours of attorney and legal assistant time.  Collective actions are naturally challenging and complex, requiring skilled attorneys and expert testimony to litigate and compute damages. The high number of hours expended necessarily limited the number of other cases that counsel could work on while pursuing this case. The fees sought are customary in the area for specialized legal services. Plaintiffs' Counsel has obtained a substantial recovery for the class members, as on average each of them will receive a net payment, free from deductions for service awards, attorneys' fees or costs, of ███████. Lead counsel cumulatively have over 150 years' experience in the employment field. This case was also taken on a contingency basis, and thus, Plaintiffs' Counsel undertook substantial risk of non-payment if the case was not successful.

### COSTS AND EXPENSES INCURRED IN THE HALLEEN LITIGATION

38.     SLG expended a total of $75,590.03 in unreimbursed expenses in connection with the prosecution of this litigation, and anticipates and additional $25,000.00 in expenses in relation to the administration of this settlement, based on estimated costs from settlement claims

administrator Rust Consulting, for the total incurred and anticipated costs of $100,590.03 as follows:

| | |
|---|---|
| Filing and Court Fees | $700.00 |
| Service of Process | $75.00 |
| Court Reporter, Transcripts, and Deposition Video | $12,758.63 |
| Travel for Depositions, Hearings and Mediation | $32,161.26 |
| Postage/Express Mail | $1,110.14 |
| Notice of Lawsuit to Nearly 1,800 STMs (Rust Consulting) | $24,000.00 |
| Anticipated Settlement Administration (Rust Consulting) | $25,000.00 |
| Mediation Costs | $4,785.00 |
| **Total** | **$100,590.03**[1] |

39.     The expenses incurred in the prosecution of this case are reflected on the books and records of the firm.  These books and records are prepared from expense vouchers, receipts, and check records, and are accurate regarding all the expenses incurred.  Copies of the expense documents can be provided to the Court if requested.

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of November 2018.

_____/s/ Gregg I. Shavitz_____
Gregg I. Shavitz

---

[1] These costs do not include the costs incurred by our co-counsel, HGR, which are set forth in the Declaration of Marc Hepworth being filed together with this declaration.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| HOPE HALLEEN and DONNA MANER, individually and on behalf of all other similarly situated, | |
| Plaintiffs, | Civil Action No. 4:16-cv-00055-ALM |
| v. | |
| BELK, INC., | |
| Defendant. | |

## DECLARATION OF MARC S. HEPWORTH FOR FINAL APPROVAL OF COLLECTIVE ACTION SETTLEMENT, FOR AN AWARD OF EXPENSES AND ATTORNEYS' FEES, FOR APPROVAL OF SERVICE PAYMENTS TO THE CLASS REPRESENTATIVES AND FOR PAYMENT OF ADMINISTRATOR EXPENSES

Marc S. Hepworth, an attorney admitted to the bar of this Court, declares, under penalty of perjury that:

I am a partner in Hepworth Gershbaum & Roth PLLC, co-counsel for Hope Halleen and Donna Maner, individually and on behalf of all other persons similarly situated ("Class Representatives" or "Plaintiffs"), in this action.  I am fully familiar with the facts and circumstances set forth herein, and I make this Declaration in support of the Plaintiffs' Motion for approval of the following: (i) the settlement set forth in the Stipulation and Settlement Agreement; (ii) the Parties' proposed notice and the mailing of the Notice Packet and Settlement Check; (iii) appointment of Rust Consulting, Inc. as the Claims Administrator and its fees and costs for issuing the Notice and the Settlement Checks; and (iv) Plaintiffs' Counsel's request for reasonable attorneys' fees and reimbursement of costs and expenses. The testimony set forth herein is based on first-

hand knowledge about which I would and could testify competently in open court if called upon to do so, and on contemporaneously-generated records kept in the ordinary course of law practice by my firm.

My firm first became involved in this litigation when, in early 2016 when we were retained by Plaintiff Hope Halleen, to prosecute the claims for overtime wages.  Our firm along with Co-counsel, SHAVITZ LAW GROUP, P.A. (hereinafter "SLG") investigated the Plaintiffs' claims and filed the Complaint in this action on January 19, 2016.

Several attorneys from my office other than myself, including Charles Gershbaum, David A. Roth, Rebecca Predovan, Janine Kapp, Joshua Cittadino and Melissa Young and Paralegals Ian Biggs, Andrew Hepworth, and Amy Goldreyer performed various litigation and related tasks as set forth herein.  Particularly, my firm has been involved in every aspect of this litigation since its inception.  As summarized below, the proposed Settlement was the product of Hepworth Gershbaum & Roth PLLC (hereinafter "HGR") knowledge as to the risks of further litigation, the nature of the claims and defenses, and that future proceedings would be fiercely litigated including a lengthy trial.  HGR and SLG reached this settlement only after having succeeded in overcoming a many litigation hurdles.

Throughout the duration of this case, HGR performed many tasks including, but not limited to:

(1)    investigated the Plaintiffs potential overtime claims; (2) researched and analyzed the relevant law based upon the information initially provided by the clients concerning their job duties as Belk Inc. (hereinafter "Belk") Sales Team Managers

(hereinafter "STMs"); (3) Interviewed Plaintiffs and reviewed documents provided by the

Plaintiffs so as to get a better understanding of internal paperwork that would support the

claims in the case; (4) compared and contrasted this case to other misclassification cases;

(5) reviewed and analyzed various Belk, policies including their policy of not paying

STM managers overtime and review documents provided by Plaintiffs; (6) performed

legal research regarding Belk potential defenses;  (7) reviewed and researched other cases

brought against Belk over the years in anticipation of the good faith defense; (8)

researched and considered the viability of a collective action versus a class action against

Belk, or bringing the matter as a hybrid claim; (9) researched and considered the issues as

to venue and stand alone Rule 23 claims; (10) developed a manner in which to present

claims and handle preparation of same; (11) researched, drafted, edited, and filed

multiple Pro Hac Vice Motions; (12) Drafted and served a document preservation letter

to Defendant; (13) conferred with defense counsel as to answering the complaint and

extension of time for same; (14) reviewed Defendant's Corporate Disclosure; (15)

Research as to change of venue; (16) Oppose Motion for Change of Venue; (17)

undertook ESI preservation discussions with the Defendant; (18) drafted and exchanged

an ESI preservation letter; (19) met and conferred with the Defendant for the Rule 26(f)

report; (20) draft initial disclosures and serve same on Defendant; (21) meet and confer

and prepare the joint status report submitted to the court; (22) research as to submitting

an early conditional certification motion; (23) review and edit the conditional

certification motion;  (24) prepare declarations in support of the conditional certification

motion; (25) review and discuss the Defendant's opposition to the motion for conditional

certification and draft/edit the reply to same; (26) filed a motion for a corrective order as

to the claims period should begin from the mailing of the notice not date the list is produced; (27) prepared and edited the notice and worked with the Third Party Administrator to send out the notice; (28) Follow up with the Defendant as to making sure the notice and consent were properly posted; (29) Review and file the notices of consents in a timely fashion;(30) follow up with Rust Consulting (Third Party Administrator)  as to notices; (31) meet and confer as to the joint status report; (32) Telephone conferences with the court; (33) Draft and edit the 30(b)(6) notice; (34) Draft and prepare the and ESI conferral letter; (35)Interviewed STMs to ascertain the names of documents and types of communications that would assist in drafting demands; (36) draft the plaintiffs first set of interrogatories; draft the plaintiffs first set of request for production based on conversations with the Plaintiffs;(37) Compare and contrast this action as to work weeks with other similar sized actions; (38) draft responses to Defendant's request for production; (39) draft responses to Defendant's request for interrogatories; (40) contact approximately 25 Plaintiffs and Opt in Plaintiffs to respond to the Defendant's Interrogatories, and Request for Demands, as well as document gathering, including metadata; (41) Based upon multiple conversations with the 25 Plaintiffs and Opt In Plaintiffs responses to request for production of documents and request for interrogatories; (42) Prepare multiple Opt in Plaintiffs for depositions, including extensive document review with the deponents; (43) multiple meet and confer letters with the Defendant as to their deficiencies in responses; (44) multiple conferences with the Court as to disagreements re location of deposition; documents production before the deposition necessity, time of depositions, who could sit in the deposition, (45) review the Defendant's production and draft and deficiency letter; (46) multiple ESI

discussions both internal and with Defense counsel as to ESI protocols and production; (47) amend a response to various Request for Production responses for multiple Opt In Plaintiffs; (48) draft multiple 30 (b)(1) notices of deposition; (49) extensive discovery issues that Defendant fails to produce discovery; (50) prepare for and travel to North Carolina and appear at and defend deposition; (51) prepare for and  travel to Atlanta, and appear at and defend deposition; (52) prepare for and  travel to Alabama, and appear at and defend deposition; (53) prepare for and travel to Alabama again, and appear at deposition which resulted in court conference call and deponent refusing to testify due to management at deposition- resulting in ruling for future depositions; (54) prepare for and subpoena non-party witness to testify in this action; (55) prepare for and travel to Jacksonville, Florida, and appear at and take a deposition pursuant to subpoena; (56) extensive discovery issues as a result of Defendant's failure to produce the STM time studies and subsequent production; (57) opposition to motion to strike the non-responsive Opt-in Plaintiffs; Prepare for mediation, including obtaining data and preparation of multiple damages models; (58) prepare for and travel to Dallas Texas, to attend a full day mediation; (59) prepare for and take steps as to possible decertification of the action; (60) prepare for 30(b)(6) deposition of the Defendant; (61) draft motion to Court regarding deficient production; (62) constant communication with Opt-ins and discussion re deficient studies and documents and studies regarding the STM position; (63) learn about Mr. Raetz and multiple conferences with him regarding production for a deposition; (64) Travel to Florida for a deposition of the subpoenaed witness Mr. Raetz; (65) prepare Reply to the discovery motion with Raetz's information from deposition; (66) oppose motion from Defendant to be relieved as counsel; (67) multiple phone and in-person meet

and confers regarding ESI production and the Order from the Court; (68) continued telephonic conversations with the Court re: discovery and depositions (69) attempt to work with Defendant regarding their production of documents and draft status conference letters to the Court; (70) conducted extensive ESI discussions with Defense counsel, regarding disputes as to their compliance and discussed strategy with co-counsel as to the appropriate search terms that would ascertain the information that would be probative to Plaintiff's case; (71) corresponded with Defendant regarding deficiencies in their ESI productions for failure to comply with the ESI protocols as per the first phase agreement which required additional analysis and review; (72) continued extensive and numerous ESI conferences with the Defendant as to Hit lists and reports, and production of search results based upon our agreed search terms; (73) conducted numerous discussions with co-counsel regarding continued ESI issues as to the missing metadata from Defendant's productions and the hit reports that the Defendant agreed to produce; (74) conferenced with Defendant regarding continued  ESI issues to work out the proper production and other ESI disagreements over the reports that were to be provided as well as the timing for same (75) after the August Order, created strategies and protocols to handle potentially 18 million documents that would need to be exchanged, to comply with the Court's Order, (76) drafted ESI protocols including protocols for production of discovery ESI, the format of data exchanged, manner in which the ESI would be identified; (77) developed strategies to review and examine large volumes of data, including research in various forums from the Sedona conference to other ESI decisions from other jurisdictions that governed the varied issues that are associated with large volume production of ESI; (78) due to the scope of ESI, and the problems inherent in the

production, examined various methods used to better search and to analyze said data; (79)

Determined the scope of various records such as emails to and from Plaintiffs and Opt Ins

to and from corporate custodians, created sample date ranges to be produced and hit

reports to be exchanged to streamline the productions; (80) reviewed the Defendant's

multiple ESI productions and analyzed them to figure out how to eliminate junk emails

that were wasting time being reviewed and hosted by both parties; (81) conducted

numerous in-person and phone conferences regarding ESI issues with the Defendant,

including the creating hit report protocols, search methodology, and numerous

streamlining plans to eliminate non responsive documents that were being produced; (82)

developed cutting edge protocols for "subject line" eliminations to streamline

Defendant's productions as the ESI search terms as produced by Defendant were creating

hundreds of thousands of near duplicates for just one discovery Opt-In email box which

would have been millions had the case not settled; (83) strategized with ESI tech vendor

regarding the ESI received from Defendant and the manner in which the a protocol could

be created to limit the hundreds of thousands of duplicate or unreadable pages that were

being produced by Defendant; (84) Conferenced on numerous occasions with Defendant

about appropriate indexing for the numerous productions being produced; (85) created

strategies that allowed quicker review and analysis to review hundreds of thousands of

documents produced to ascertain how such few custodians were producing so much ESI

and then to identify relevant documents and develop strategies how to obtain these

documents without the need to cull through millions of pages of irrelevant ESI; (86)

began internal technology assisted review protocol and analysis; (87) reviewed numerous

letters and emails of ESI proposals from Defendant and developed strategies to accept

reports and spreadsheets that summarized the information for different types of ESI such as payroll data which we streamlined from was going to be  millions of pages and reduced it to one spreadsheet; (88) analyzed and created a plan to obtain documents from the Defendant's all-encompassing web portal; (89) reviewed numerous ESI productions that Defendant sent and placed upon a review platform; (90) began the process of finding and identifying the correct custodians so as to determine who we need to depose; (91) analyzed and reviewed documents productions to deter review the near one million pages of discovery produced by the Defendant; (92) reviewed productions received prior to August ESI Order and ascertained what documents were missing metadata and the effect the lack of metadata had upon the ability to search the data without the agreed upon Metadata, and the multiple conferences with the Defendant as to providing proper metadata; (93) discussed and strategized with co-counsel as to how to respond to the Defendant's request for a trial plan; (94) along with co-Counsel approve, edit and finalize the filing of the present motion for final approval and other relief.

The total number of hours spent on this litigation by my firm has been 2,161.4. The total lodestar amount of time based on the firm's billing rates is $1,151,789.00.[1] Time expended in preparing the present application for fees and reimbursement of expenses has not been included in these totals.  My firm's lodestar figures are based upon time records maintained by my firm and the firm's billing rates, which do not include charges for expense items.  Specifically, the following attorneys and staff worked on this

---

[1] This is not the usual and customary rate that is charged to our clients who retain our firm by the hour. The HGR firm has been approved at $750.00 per hour for Partners and $450.00 per hour for associates in other Wage and Hour cases. However, in order to conform to the rates in this Circuit, HGR has submitted a reduced rate.  It should be noted that at this point in time, HGR is working on a negative lodestar.

case, for the hours set forth below, to obtain the lodestar figures:

| NAME | TITLE | HOURS | HOURLY RATE | TOTAL |
|---|---|---|---|---|
| Marc S. Hepworth | Partner | 569.1 | $600.00 | $341,460.00 |
| David A. Roth | Partner | 677.1 | $600.00 | $406,260.00 |
| Charles Gershbaum | Partner | 231.5 | $600.00 | $138,900.00 |
| Rebecca Predovan | Associate | 410 | $465.00 | $190,650.00 |
| Joshua Cittadino | Associate | 133 | $330.00 | $43,890.00 |
| Janine Kapp | Associate | 61.3 | $330.00 | $20,229.00 |
| Melissa Young | Associate | 16.4 | 250.00 | $4,100.00 |
| Ian Biggs | Paralegal | 7 | $100.00 | $700.00 |
| Andrew Hepworth | Paralegal | 21 | $100.00 | $2,100.00 |
| Amy Goldreyer | Paralegal | 35 | $100.00 | $3,500.00 |
| TOTALS | | 2,161.4 | | $1,151,789.00 |

Expense items are billed separately, and such charges are not duplicated in my

firm's billing rates.

My firm incurred a total of $30,186.82 in un-reimbursed costs and expenses in

connection with the prosecution of this litigation, as follows:

| | |
|---|---|
| Court Fees/Service of process | $400.00 |
| Court Reporters | $10,555.22 |
| Postage/Express Mail/Messenger/Copy/Record Fee | $794.60 |
| Transportation/Meals/Travel | $16,103.77 |
| ESI- Storage/upload | $2,333.23 |

| TOTAL | $30,186.82 |
|---|---|

The time records and expenses incurred in the prosecution of this case are reflected on the books and records of this firm, which are available for submission to the Court *in camera* upon request.  These books and records are prepared from expense vouchers, receipts, and check records, and are accurate regarding all the expenses incurred.

**<u>Firm and Attorney Background</u>**

Hepworth, Gershbaum & Roth, PLLC, is a civil litigation firm dedicated to representing plaintiffs in class action lawsuits with an emphasis in bringing class and collective actions on behalf of the wage earner against companies who violate the Federal Labor Standards Act and/or State Labor Laws.

The firm was formed by experienced litigators, each partner having successfully litigated numerous cases, and handling complex litigation resulting in settlements totaling tens of millions of dollars.  The attorneys of Hepworth, Gershbaum & Roth. PLLC, are actively sought by other attorneys to assist as co-counsel to prosecute Wage and Hour cases within the State of New York and throughout the United States.

Our attorneys have lectured at continuing legal education courses and have published articles on civil litigation subjects and lobbied to pass litigation to protect the public.  The attorneys at Hepworth, Gershbaum & Roth, PLLC, continue to actively lobby for consumer rights and injured victims' rights to ensure that a person's right to a safe environment is upheld and continues to be protected under the law.

## Marc S. Hepworth

Marc S. Hepworth is a founding partner in Hepworth, Gershbaum & Roth, PLLC, a firm dedicated to protecting the rights of the individual against corporate defendants. Mr. Hepworth specializes in collective and class actions as well as representing plaintiffs who have suffered catastrophic injuries through the wrongful conduct of others.  He has successfully litigated and recovered millions of dollars for the clients he represented and has been the attorney for thousands of plaintiffs fighting against corporations throughout the United States.  Mr. Hepworth is Lead Counsel or Co-Counsel in numerous class actions presently before this Court. Prior to forming Hepworth Gershbaum & Roth, PLLC, Mr. Hepworth was of counsel to Roth & Roth, LLP, and acted as a solo practitioner.  He has been active in lobbying for consumer rights to ensure that the laws are not changed to hurt those who need it most.  In addition, Mr. Hepworth has been published on numerous occasions.

Mr. Hepworth graduated from Binghamton University in 1993 and received his law degree from Benjamin N. Cardozo School of Law in 1998.  He is admitted to practice in New York State Courts as well as the Eastern and Southern District Courts of New York.  Mr. Hepworth is a member of the following Professional Associations and Organizations: New York State Trial Lawyers Association, American Association of Justice, National Employment Lawyers Association, National Employment Lawyers Association/New York, National Association of Consumer Advocates, Association of the Bar of the City of New York City, Workers Injury Law & Advocacy Group and the Federal Bar Council.

Mr. Hepworth lectured on numerous occasions including but not limited to on

behalf of the Ohio Association of Justice on the topic of "Preparing For and Taking a 30(b)(6) Deposition in an FLSA case."  In Park City, Utah, Wage and Hour webinars and in-person seminars for Strafford Publications on topics ranging from Asserting and Challenging Affirmative Defenses to presentation of Damages.

Mr. Hepworth has also been acknowledged by his colleagues in numerous forums as he has been selected to Super Lawyers since 2014 in Employment Law as well as selected as a Top 100 Trial Lawyer by the National Trial Lawyers.

**Charles Gershbaum**

Charles Gershbaum is a founding partner in Hepworth, Gershbaum & Roth, PLLC, a firm dedicated to protecting the rights of the individual against corporate defendants.  Mr. Gershbaum has been a civil litigator for over twenty years.  The first decade of practice was spent in court on a daily basis, fighting for individual rights and litigating cases from inception through trial and appeal.  Mr. Gershbaum has represented thousands of plaintiffs fighting against corporations and/or some of the largest insurance companies and municipalities in New York, obtaining justice either through settlement or verdict in both state and federal venues.  After the first decade of practice, Mr. Gershbaum was a founding partner in the firm Gershbaum and Weisz, PC, located in Manhattan. The firm represented plaintiffs exclusively.

Mr. Gershbaum is proud to be an active member of the New York State Trial Lawyers as well as a trial lawyer committee member, who has dedicated his time to preserving the rights of the individual against large defendants and/or municipalities as well as lobbying for consumer rights.  In addition, Mr. Gershbaum has been published on numerous occasions and has appeared in both the Jury Verdict Reporter, the New York

Law Journal as well as been profiled in the Kyodo News based in Tokyo, Japan.

Mr. Gershbaum graduated from Yeshiva College in 1987 and received his law degree from the Benjamin N. Cardozo School of Law in 1990 having been a member and editor of the Cardozo ILSA Journal of International Law.

Mr. Gershbaum is a member of the following Associations and Organizations: New York State Trial Lawyers Association, American Association of Justice, American Bar Association and the New York State Bar Association. Mr. Gershbaum has been and still is selected by his peers as a Super Lawyer.

**David A. Roth**

David A. Roth is a founding partner in Hepworth, Gershbaum & Roth, PLLC, a firm dedicated to protecting the rights of the individual against corporate defendants. Since 1991, Mr. Roth has been representing plaintiffs who have had been injured, had their civil rights deprived or have duly earned wages and benefits denied them by their employers. Mr. Roth has represented thousands of plaintiffs in actions against corporations, insurance companies, and municipalities. He has prosecuted and tried numerous civil cases in the courts in and around the City of New York at the state, appellate and federal venues. As a respected trial attorney, Mr. Roth is constantly sought out as co-counsel and trial counsel by fellow attorneys both in and out of the State of New York. Additionally, Mr. Roth has been admitted including, but not limited to, California, Pennsylvania, New Jersey, Texas, Florida, Illinois, Delaware, Massachusetts, and Virginia to try cases in those venues.

Mr. Roth is a feature lecturer and has lectured on many different aspects of civil litigation and has been published several times in the New York State Trial Lawyers'

semiannual publication, on such topics as: several articles regarding municipal liability

such as Municipal Liability, taking Corporate Depositions, Complicated products issues

regarding Bus Interlock's as well as issues independent medical examinations of

concerning traumatic brain injury cases.

Mr. Roth graduated from the State University of Buffalo in 1988 and received his

law degree from Albany Law School in 1991.  Mr. Roth is a member of the American

Association for Justice as well as the New York State Trial Lawyers Association. Mr.

Roth has been an officer in the New York State Trial Lawyers Association (NYSTLA)

for 4 years, and currently holds the position of First Vice President.  NYSTLA is the

largest State plaintiff's trial bar in Country.  He has been an active Dean of the New York

State Trial Lawyers Institute (NYSTLI), the Continuing Legal Education arm of

NYSTLA, which was voted the number one Continuing Legal Education provider in

New York State Law Journal poll for many years.  He also serves on both the Executive

Committee and Board of Directors for the New York State Trial Lawyers Association

where he is active in setting policy and lobbying for victim's rights and serves on several

committees.

He is the chair of the Municipal Liability Committee, the Website Committee, and

a member of various other committees.  Mr. Roth was selected by his peers as a Super

Lawyer for the second year in a row.  In association with his committee chairs Mr. Roth

is active in lobbying efforts as well as the drafting and reviewing new legislation for New

York wage and hour law.

Mr. Roth has been involved continuing legal education since 2013 and has been

part of guiding and creating continuing legal education programs for both plaintiffs and

defendants in the New York City area.  Mr. Roth has lectured in numerous areas including Trial Tactics for the New York State Trial Lawyers Association; General Litigation for the Queens Bar Association; Technology in the Courtroom, for the New Jersey Association for Justice; Municipal Transit liability for both the New York State Trial Lawyers Association and New Jersey Association for Justice; created and chaired the two-day CLE program known as the Subway Series, a program for the New York State Trial Lawyers Association regarding the complexities and nuances of litigating against Transportation Authorities which has been several times since 2010.

Additionally, Mr. Roth has created and chaired the full-day municipal liability program, the "Plaintiff's Arsenal" which was presented in 2013 and again in November of 2015.

Mr. Roth has also lectured in the "Evidence to Win" program, one of the largest programs run by NYSTLI, and lectured again for the "Evidence to Win" program in 2016.  David Roth has additionally lectured for the NYSTLI "Decisions 2015" program which collectively has hundreds of attendees and is the premier Continuing Legal Education program run by NYSTLI, covering all the most recent developments in case law for the previous year.  Mr. Roth additionally has lectured for the American Association of Justice at their national convention on the topic of municipal liability for transportation systems in Baltimore in 2014.  Currently Mr. Roth has also created a cutting-edge program regarding the Freedom of Information Law which was held in February 2016 where the New York State Director of Committee for Open Government will be lecturing for him.

**Rebecca Predovan**

As an Associate Attorney with Hepworth, Gershbaum & Roth, PLLC, Ms.

Predovan works to advance the Firm's nationwide class action practice.  Ms. Predovan has significant experience asserting rights of employees in complex civil litigation matters, including but not limited to, providing aggressive representation for employees in connection with discrimination, benefit, wage and hour and other employment law claims.  Ms. Predovan' s cases have been included in a number of professional and news based publications.

Ms. Predovan graduated, *cum laude* from the State University of New York at Albany in 2004 where she received her degree in English. She then received her law degree from Albany Law School in 2009, where she served as the Symposia Editor for the Albany Law School Journal of Science and Technology. She is admitted to practice in New York State Court, the Eastern and Southern District Courts of New York as well as before the United States Court of Appeals for the Second Circuit. Ms. Predovan has also been admitted pro hac vice in a number of jurisdictions in connection with her representation of employees in federal court against corporate defendants throughout the country.  Ms. Predovan is an active member of the New York State Bar Association and National Employment Lawyers Association.  In 2017 and 2018, Ms. Predovan was selected for inclusion in Super Lawyers' list of rising stars.

**Joshua Cittadino**

Mr. Cittadino graduated the State University of New York at Cortland in 2009 where he received his degree in Sport Management.  He then received his law degree from Barry University, Dwayne O. Andreas School of Law in 2014.  He is admitted to practice in New York and Florida.

**Janine Kapp**

Ms. Kapp graduated, from Pitzer College in 2009 where she received her degree in Psychology.  She then received her law degree from Hofstra University School of Law in 2015.  She is admitted to practice in New York State Court, and the Eastern and Southern District Courts of New York.  Ms. Kapp has also been admitted pro hac vice in a number of jurisdictions in connection with her representation of employees in federal court against corporate defendants throughout the country.

**Prior Notable Cases**

HGR has been involved in complex Wage and Hour cases, involving extensive litigation, including Multi-District Litigation and has resolved numerous cases involving wage and hour class actions.  These include but are not limited to the following cases:

*Youngblood v. Family Dollar,* 1:09-cv-03176 (S.D.N.Y) (co-counsel in a misclassification store manager case, wherein the Rule 23 case was certified and subsequently settled for 14 million); *Hegab v. Family Dollar Stores, Inc.*, 1:11-cv-01206 (D.N.J.) (co-lead counsel on a wage and hour misclassification matter settled for $1,150,000); *Fermin v. Rite Aid of New York, Inc.*, 1:08-cv-11364 (S.D.N.Y.) (co-lead counsel on a wage and hour misclassification matter, settled as part of the *Craig v. Rite Aid,* 4:08-cv-02317(S.D.N.Y.) for ($20,900,000.00)*; Ibea v. Rite Aid Corporation,* 1:11-cv-5260 (S.D.N.Y) (co-counsel on a misclassification case certified under FLSA 216(b) as a collective action, settled as part of *Craig v. Rite Aid,* 4:08-cv-02317(S.D.N.Y.) for $20,900,000.00)*; Ferreira v. Modell's et al.*, 1:11-cv-02395 (S.D.N.Y.) (co-lead counsel on a wage and hour misclassification case certified under FLSA 216(b) as a collective action, settled); *Charles v. Nationwide Mutual Insurance Company, Inc.,* 1:09-cv-0094

(E.D.N.Y) (co-lead counsel on a wage and hour "off the clock" claim, settled); *Morales, et al., v. Sovereign Bank,* Case No.: 13 160 02098 11 (co-lead counsel on a wage and hour misclassification case settled for $1,450,000.00 via mandatory arbitration); *"Doe's" v. "Smith" Corporation*, (a confidential seven figure settlement for five African Americans subjected to employment discrimination on the basis of their race); *Ogaian v. Bed Bath and Beyond, Inc., et al.*, 12-cv-01273 (S.D.N.Y.)(co-lead counsel on a wage and hour misclassification matter, settled); *Dickerson-Muhammed v. West Customer Management Group, LLC.*, Index No. 21322/2008 (Sup. Ct. County of Queens) (co-lead counsel on a wage and hour case resolved under a confidentiality agreement); *Caballero v. Zaloumis Contracting Service, et al.*, 1:11-cv-01121 (S.D.N.Y.) (co-lead counsel on a wage and hour matter resolved); *McKee v. Petsmart, Inc.*, 1:12-cv-01117 (D. Del.) (co-lead counsel on a wage and hour misclassification, certified under FLSA 216(b) as a collective action; and settled for $3,800,000.00); *Cunningham v. EDS,* 1:06-cv-5260 (S.D.N.Y) (Co-lead counsel on a misclassification case certified under FLSA 216(b) as a collective action and settled for a Maximum Gross Settlement Amount of $11,800,000.00); *Costello, et. al. v. Kohl's Illinois Inc. et. al.,* 1:13-cv-1359 (S.D.N.Y.) (Lead counsel on a wage and hour misclassification case certified under FLSA 216(b) as a collective action and settled for $4,000,000.00); and *Bedoya, et. al. v. Level 42 Associates, LLC et al., 14-cv-01333* (S.D.N.Y.)(counsel on a wage and hour collective and class action, settled); *Kellgren v. Petco Animal Supplies, Inc.,* 3:13-cv-00644 (S.D. Ca) (co- Lead counsel on a wage and hour misclassification case certified under FLSA 216(b) as a collective action and settled for $7,900,000.00); *Burns v. The TJX Companies, Inc.,* (D. Mass.) (co-lead counsel on a wage and hour collective and class

action wherein the training portion was settled for $4,800,000.00); *Maar et al. v. Beall's Inc.*, 2:16-cv-14121-DMM (S.D. Fl) (co- Lead counsel on a wage and hour misclassification case certified under FLSA 216(b) as a collective action and settled for $1,200,000.00); and many others including a litany of present active cases that can be provided to the Court upon request.

Attached hereto at **Exhibit A** is a copy of a brief biography the Hepworth, Gershbaum & Roth, PLLC, firm.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true to the best of my knowledge, information and belief.

Dated:  New York, New York
      November 19, 2018

By:    <u>s/ Marc S. Hepworth</u>
       Marc S. Hepworth